**Alfred R. DYER, Petitioner–Appellant,**

**v.**

**Arthur CALDERON, Warden, Respondent–Appellee.**

No. 95–99002.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1995.

Decided May 5, 1997.

As Amended Aug. 19, 1997.

Order Granting Rehearing Oct. 9, 1997.

Jon B. Streeter, Orrick, Herrington & Sutcliffe, San Francisco, CA, for petitioner-appellant.

Dane R. Gillette, Deputy Attorney General, San Francisco, CA, for respondent-appellee.

Before: WALLACE, FLETCHER, and BRUNETTI, Circuit Judges.

WALLACE, Circuit Judge.

Dyer, a California state prisoner under sentence of death, appeals from the district court's denial of his petition for writ of habeas corpus relief under 28 U.S.C. § 2254. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 1291 and 2253. We affirm.

## I

On November 8, 1980, Dyer (armed with a .38 caliber handgun), Michael Jackson (Dyer's stepbrother), and Cleveland Ario (armed with a .45 caliber semiautomatic pistol) drove to the home of their friend, Belinda Murray. She lived in a two-level apartment in Oakland, California, along with her brother Floyd, her friend Nora Fluker, and Fluker's four children. Dyer, Jackson, and Ario brought cocaine and a bottle of wine, which they drank.

Some time later, Belinda Murray's friend, Bennie Warren, arrived. Warren had never met Dyer before, but found him to be "stable-minded," "intelligent," and entirely in control of himself. Later, Belinda Murray, Dyer, Jackson, and Ario went upstairs to Belinda's bedroom. Warren was told to stay downstairs. Once upstairs, Ario injected Belinda Murray, Dyer, and himself with a "speedball"—a mixture of heroin and cocaine. Jackson and Fluker also used the drugs. Dyer appeared to have received a small dose, which had no apparent effect on him.

Dyer, Jackson, and Ario then left Belinda Murray's apartment. Belinda and Warren also left, returning later with gum, cigarettes, and a bottle of wine. At that time, Floyd Murray was upstairs with Fluker's sleeping children. Dyer, Jackson, and Ario returned approximately midnight. The three went upstairs with Belinda Murray and Warren to Belinda's bedroom, where Dyer, Jackson, and Ario again injected themselves with drugs. Dyer then laid down on Belinda's bed, covered his eyes with his arm, and rested. Ario gave his .45 caliber gun to Belinda Murray, and she placed it in the closet. Warren left the apartment soon thereafter, and Jackson and Ario followed.

Dyer arose after about five minutes and appeared startled. He noticed that his rings were missing and asked Belinda Murray if his stepbrother Jackson had removed them from his fingers. Belinda told Dyer that she did not know, but said that Warren had been nearby when he fell asleep. Dyer concluded

that Warren must have taken his rings. Dyer told Belinda to give him Ario's gun, which he stuck inside his pants along with his own .38 caliber pistol. Dyer then asked Belinda to accompany him through the housing project in search of Warren so he could locate his missing rings.

Dyer conversed with Belinda Murray as they walked. He appeared angry, but not intoxicated. He told her that he was going to kill Warren if he found him that evening and if not, he was going to "whip his ass" once he did.

When Belinda Murray and Dyer returned, Belinda went upstairs while Dyer sat downstairs on the couch. Belinda heard a knock on the door and, looking out her bathroom window, saw Warren standing at the front door. Belinda rushed downstairs and found Dyer pistol-whipping Warren on the head with both guns. Warren's face was bloody and he was almost unconscious. Dyer demanded that Warren return his rings. Warren denied having them and Dyer told him, "You better pray my brother has my rings." At all times during the beating, Dyer appeared angered, but in control of himself.

Within minutes, Jackson and Ario arrived. Jackson asked Dyer what was the matter. Dyer, with a gun in each hand, pushed Jackson away. Jackson, upset by Dyer's act, left the apartment. Belinda Murray and Fluker followed Jackson outside and quieted him down. When Jackson came back inside, Dyer gave him one of the guns and Jackson immediately became violent. He pushed both Belinda Murray and Fluker and told them not to move. Upon Dyer's command, Ario searched Warren, but did not find Dyer's rings. During the search, Dyer kept his gun pointed at Warren and told him he was "a dead man."

Upon hearing Dyer's threat, Ario told Dyer that if he killed one of them he would have to kill the others as well. Dyer replied, "Man, I'm not killing no babies." Ario then went upstairs to get Floyd Murray. Jackson marched at gunpoint the four captives—Fluker, Warren, Belinda, and Floyd Murray—into the back seat of a car. Dyer joined Jackson and Ario in the front seat.

The four hostages urged whomever took the rings to return them. No one, however, admitted to having the rings. Jackson finally turned around, gun in hand, and ordered them to "shut up." Ario said that they should "kill that bitch first," referring to Belinda Murray. During the ride, Floyd Murray asked Dyer several times, "Why do you want to take me out?" Dyer told him to "shut up" and stuck his gun in Floyd's face.

After about ten minutes, the car stopped and Dyer said, "Get out." Dyer pointed the .45 caliber weapon at the four hostages and instructed them to walk straight ahead. Jackson ordered them to lie face down on the ground. Before lying down, Belinda Murray saw that Dyer still had a gun.

After she lay down, Belinda looked up and could see "the fire coming" as the first shot was fired. She threw her arms up over her head and passed out.

Although ordered to lie face down, Floyd Murray remained on his knees. Warren (who had been a member of the National Rifle Association since age 13 and was very familiar with guns) then heard three shots from the .38 caliber revolver come from his left, where Belinda Murray was lying. He then heard scuffling noises, as if someone was being beaten. Someone said, "This bitch ain't dead yet." Warren heard a few more shots and heard someone say, "If she's not dead now, she'll be dead by morning." Warren thought the additional shots also came from the .38 revolver.

Warren next heard shots from the .45 caliber gun, followed by more scuffling. He heard someone walk toward him, looked up, and saw Dyer holding the .45 about a foot away from Fluker. Dyer fired three shots; each time a bullet entered Fluker's body, Warren "could feel her fluttering and jumping."

Dyer then stepped in front of Warren, who got up on his knees. He pointed the gun at Warren's head and fired. Warren flipped over backwards and, before losing consciousness, heard someone say, "If they're not dead now, they'll be dead by morning," and someone else say, "check their pulse."

When Belinda Murray regained consciousness, she felt someone taking her pulse and heard him say, "The bitch is not dead." A gun was placed against her head and Belinda heard three clicks, but the gun did not fire. She "played dead" until Jackson, Dyer, and Ario left. None of them appeared intoxicated at any time during the evening.

Eventually, Belinda Murray managed to get up, locate a phone, and contact an ambulance and the police. Warren also managed to flag down a police car and was taken to a hospital.

An autopsy of Floyd Murray's body revealed four gunshot wounds to the head and shoulder, at least two of which were caused by .38 caliber bullets. An autopsy of Fluker's body disclosed three gunshot wounds to the head and shoulder blade, at least one of which was from a .45 caliber gun and at least one from a .38 caliber gun.

## A.

Dyer's theory of defense was diminished capacity. Dyer did not deny or attempt to justify his actions. Instead, he claimed that his own mental faculties were impaired by his consumption of drugs and alcohol. Dyer testified that he snorted cocaine and drank wine and brandy with Jackson and Ario before they went to Belinda Murray's apartment. At the house, Ario injected him with a combination of cocaine and heroin.

Dyer testified that when he left Belinda's apartment with Jackson and Ario, they went to the home of Delphine "Dee" Dismuke, where Dyer smoked marijuana, snorted cocaine, and drank gin. According to Dyer, the three men then returned to Belinda's house where Ario injected him again. Dyer testified that he fell asleep, and after he woke up, noticed that everyone had left and that his rings, money, and .38 caliber gun were missing. Dyer said he asked Belinda Murray what happened to his gun and whether his brother had his rings. She told him that she had put his gun in the closet with Ario's and that she did not know whether Jackson had his rings. Dyer asked her who was standing over him when he fell asleep and she told him that it was Warren. After retrieving both guns, Dyer testified that he and Belinda Murray walked through the housing project looking for Warren, and soon returned when their search was fruitless.

Dyer testified that when Warren arrived at the Murray house, Belinda Murray opened the door and let him in. Dyer said that he asked Warren for his rings, they began arguing, and that Dyer began hitting Warren with the guns. Dyer admitted pistol-whipping Warren but testified that he was "confused ... hurt [and] mad" and that he "didn't know ... what was actually going on." Dyer remembered pointing the gun at Jackson and Ario and pushing them away when they walked in.

The next thing that Dyer said he recalled was sitting in Jackson's car with his head down, crying. He said that Jackson put his arms around Dyer and told him that it would "be cool." Dyer remembered the car stopping, exiting the car, and hearing gun shots. He did not remember whether he fired any of the shots, but did not deny shooting anyone. When asked at trial if he killed anyone, Dyer said, "It's possible. I had a gun. I don't know."

Dyer recalled being at a friend's house the following morning, but could not remember the interim period very well. Dyer testified that he took some more cocaine at his friend's house and then called his mother. She told him that Fluker and Floyd Murray were dead and that the police were looking for him. Over four months after the shootings, Dyer surrendered to the police.

Dyer's primary witness at trial, Kate B. Yago, M.D., was certified as an expert in the area of drugs that adversely affect the brain. She opined that Dyer had been suffering from a drug overload at the time of the killings. Dr. Yago conceded that Dyer should have recalled certain events in light of his recollection of other events. Responding to a hypothetical question, Dr. Yago testified that a person such as Dyer "would have [had] to [have] be[en] clearheaded" to have acted the way he did. She was unable to name any drug-induced conditions that could account for Dyer's selective memory loss, but indicated that the drugs Dyer ingested, in isolation, often cause loss of memory. When asked if

she could think of any medical explanation for a hypothetical situation based on Dyer's testimonial account of his mental state on the night of the killings, Dr. Yago testified, "If I am to believe your hypothetical, then I can't."

### B.

The State presented no penalty-phase evidence, other than proof of Dyer's prior robbery and burglary convictions. Dyer called co-workers, his mother, and a psychologist, Dr. Thomas Hilliard, to testify at the penalty phase.

Dr. Hilliard interviewed Dyer three times. He found Dyer to be a polite, low-keyed, soft-spoken, and a cooperative man who was not evasive or malingering. Dyer was coherent, alert, and well-oriented, except for his "spotty, incomplete and confused" memory of the night of the shootings. Hilliard testified that he detected signs of "depression, anxiety and tension." Several times during the interviews, Dyer broke down and sobbed for a while before regaining his composure. Dr. Hilliard told the jury about Dyer's personal history, from infancy to the time of the killings.

Two of Dyer's co-workers testified about Dyer's dependable work habits as a bus driver and about his ability to work well with children. Dyer's mother testified about his childhood and character.

We review de novo the denial of Dyer's petition for writ of habeas corpus. *Bonin v. Calderon,* 59 F.3d 815, 823 (9th Cir.) (*Bonin*), *cert. denied,* —— U.S. ——, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). However, findings of fact made by the district court underlying its denial of Dyer's petition are reviewed for clear error. *Id.*

During the pendency of Dyer's appeal, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996(Act), 142 Cong.Rec. H3305–01 (1996) (to be codified at 28 U.S.C. § 2261). The Act does not retroactively apply to Dyer's appeal. *Jeffries v. Wood,* 103 F.3d 827 (9th Cir.1996) (en banc).

## II

Dyer contends that the presence of Jessica Freeland on the jury deprived him of his constitutional right to an impartial jury. He argues that Freeland was dishonest during voir dire, intentionally failing to disclose certain relevant information. Alternatively, Dyer argues that even if Freeland's false answers were given in good faith, we should presume Freeland was biased.

### A.

Prior to jury selection for Dyer's trial, each prospective juror was given written questions about employment, residence, family, experience with criminal proceedings, prior jury service, and prior contact with law enforcement personnel. When asked orally during voir dire, Freeland answered, "No" to the following questions:

13. Have you or any of your relatives or close friends ever been the victim of any type of crime?

\* \* \*

15. Have you or any of your relatives or close friends ever been accused of any offense other than traffic cases?

After the jury returned its guilt-phase verdict, Dyer learned that Freeland's brother Richard had been killed five to ten years earlier. The trial court called Freeland into chambers with counsel and conducted a hearing in absence of the jury. Freeland admitted that her brother had been shot and killed approximately five years earlier. She said she did not know whether any legal proceedings were instituted against "the man that accidentally shot him." Freeland explained that she answered "no" to Question 13 because she believed her brother's death was an accident and not a crime. She stated that she could be fair in Dyer's case.

The trial court found no lack of candor in Freeland's answers and denied Dyer's motion for a mistrial. In rejecting Dyer's subsequent motion for a new trial, the trial court found that the questions were ambiguous and that Freeland's responses were inadvertent.

On direct appeal, the California Supreme Court agreed that the questions were ambiguous and found no evidence that Freeland

was lying when she said that no member of her family had been a crime victim. *People v. Dyer*, 45 Cal.3d 26, 58–59, 246 Cal.Rptr. 209, 753 P.2d 1 (*Dyer*), *cert. denied*, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 347 (1988).

The district court conducted an evidentiary hearing on the issue of Freeland's bias, at which Dyer presented the following evidence to support his contention that Freeland's answer to Question 13 was dishonest: (1) Freeland was close to Richard and lived with him and her mother at the time Richard was killed; (2) Richard's death caused the family pain; (3) Freeland's mother testified against Richard's killer in criminal proceedings; and (4) Freeland's family filed a wrongful-death action against Richard's killer and recovered $15,000.

Dyer also presented evidence at the hearing that Freeland's responses during voir dire failed to reveal the following: (1) while lying on a couch, she had been attacked by her young cousin, who had a knife, but she was not hurt; (2) her father had been arrested for kidnapping his children; (3) her brother and her uncle had both been accused of crimes; (4) her family home and her car had been broken into and burglarized on multiple occasions; and (5) her former husband had been arrested for rape.

After reviewing this additional evidence, the district court refused to disrupt the state courts' findings regarding Freeland's honesty and refused to presume that Freeland was biased.

### B.

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Ir-*

*vin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523–24 (9th Cir.1990) (*Tinsley*) (internal quotations omitted), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991).

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (*Smith*). Due process only requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

Dyer is entitled to a new trial if he "first demonstrate[s] that a juror failed to answer honestly a material question on *voir dire*, and then further show[s] that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984) (*McDonough*); *United States v. Edmond*, 43 F.3d 472, 474 & n. 1 (9th Cir.1994) (holding that a showing of juror dishonesty is a necessary predicate to obtaining a new trial);[1] *Tinsley*, 895 F.2d at 524–25 (applying standard to claim of impartiality on habeas). Thus, we must begin by asking whether Dyer has shown that Freeland lied when she answered "no" to two questions on voir dire.

---

1. Dyer argues that we should follow several of our sister circuits and interpret the concurring opinions in *McDonough* to hold that a juror's dishonesty is not a necessary predicate to obtaining a new trial. *See McDonough*, 464 U.S. at 556–57, 104 S.Ct. at 850–51 (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring) ("regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option ... to order a post-trial hearing at which the movant has the opportunity to demonstrate ... bias"); *id.* at 558, 104 S.Ct. at 851 (Brennan, J., joined by Marshall, J., concurring in the judgment) ("Whether the juror answered a particular

question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in [the] determination of actual bias."); *see also Zerka v. Green*, 49 F.3d 1181, 1186 n. 7 (6th Cir.1995) (counting votes in *McDonough* and concluding that a finding of dishonesty is not a prerequisite to relief); *Amirault v. Fair*, 968 F.2d 1404, 1405–06 (1st Cir.) (same), *cert. denied*, 506 U.S. 1000, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992); *Cannon v. Lockhart*, 850 F.2d 437, 440 (8th Cir.1988) (same). We are bound to follow *Edmond* and hold that a showing of juror dishonesty is required.

### 1.

When reviewing a petition for habeas corpus, we must, absent one of eight statutory exceptions, presume the correctness of state court findings of "basic, primary, or historical facts." *Thompson v. Keohane,* —— U.S. ——, ——, 116 S.Ct. 457, 464, 133 L.Ed.2d 383 (1995) (*Thompson* ), *quoting Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) *Tinsley,* 895 F.2d at 525; *see* 28 U.S.C. § 2254(d). Because "resolution depends heavily on the trial court's appraisal of witness credibility and demeanor," *Thompson,* —— U.S. at ——, 116 S.Ct. at 465, juror impartiality is a factual issue that falls within the statutory presumption of correctness. *Id.; Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985) (*Witt* ); *see also Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985) ("[T]he state trial judge is in a position to assess juror bias that is far superior to that of federal judges reviewing an application for a writ of habeas corpus."); *Knaubert v. Goldsmith,* 791 F.2d 722, 727 (9th Cir.) (*Knaubert* ) ("We can think of no sort of factual finding that is more appropriate for deferential treatment than is a state court's credibility determination."), *cert. denied,* 479 U.S. 867, 107 S.Ct. 228, 93 L.Ed.2d 155 (1986). A trial court decision that a juror is impartial is to be given "presumptive weight," *Thompson,* —— U.S. at ——, 116 S.Ct. at 465, and "special deference." *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984) (*Patton* ).

The state trial court made findings that Freeland's answers on voir dire were not dishonest or intentionally misleading. At the in camera hearing, the trial court had an adequate opportunity to witness Freeland's demeanor and questioned her about her understanding of the circumstances surrounding her brother's death and whether she believed it would affect her partiality. The trial court refused to "characterize anything [Freeland] did or did not do as demonstrating any lack of candor." Also, the trial court found that Freeland's allegedly false answers to the two voir dire questions at issue were "inadvertent" and were given in "good faith."

We will give presumptive weight to these findings of Freeland's impartiality unless a statutory exception exists.

Dyer argues that the statutory presumption should not apply because material facts were not developed adequately at the state court hearings. 28 U.S.C. § 2254(d)(3). Alternatively, he argues that if the presumption applies, he has established by convincing evidence that the state court determinations regarding Freeland's honesty were erroneous. 28 U.S.C. § 2254(d).

### a.

Dyer contends that material facts about Richard's death were not developed adequately at the trial court proceeding. However, the trial court found that Freeland honestly believed that her brother's death was an accident, and therefore not a crime. This finding is not inconsistent with Freeland and Richard's closeness. That Richard's death seriously affected Freeland and her family is also not inconsistent with Freeland's then belief that her brother was accidentally killed. Dyer alleges that the state court and state supreme court did not know or did not consider that Freeland's mother testified against Richard's killer in criminal proceedings. Yet Dyer does not show that Freeland knew about this testimony, nor does this fact necessarily establish that she believed Richard's killer had committed a crime. Dyer also alleges that the trial court was unaware that Freeland's family instituted a wrongful death suit against Richard's killer, and that the family received civil restitution from the killer. But the state supreme court was aware of the lawsuit and settlement and upheld the trial court's finding of impartiality. *Dyer,* 45 Cal.3d at 59, 246 Cal.Rptr. 209, 753 P.2d 1. Knowledge of a wrongful death action or restitution would not be inconsistent with Freeland's belief that her brother was accidently killed. We therefore refuse to disrupt the state courts' determination that Freeland answered honestly based on evidence unknown to the state trial judge that is wholly consistent with such a finding.

But Dyer contends that the trial court was unaware that Freeland failed to reveal that

she was "attacked" by her cousin, that her father had been arrested for kidnapping Freeland and her siblings, that her uncle had been arrested for murder, that her brother had been arrested on drug charges, that Freeland's cars and homes had been burglarized on numerous occasions, and that her former husband had been arrested for rape. As to each of these additional facts, Freeland has since explained why she originally failed to disclose. Although not present at the district court's evidentiary hearing, she testified at her prehearing deposition that at the time of voir dire, she did not know about her brother's or estranged husband's arrests. She considered her uncle too remote to be family. She regarded her father's arrest for kidnapping and her cousin's assault as remote, apparently inconsequential events. She did not consider that burglaries of her homes and cars rendered her a "victim of a crime." She stated that, "I was not attempting to be deceptive. I'm just saying it was not on my mind, 'Yeah, burglary, I'm the victim of a crime.' [ ] I read ... 'victim of a crime,' ... like victim of some violent attack or something like that. Burglaries [are] not a big issue with people in Oakland." The district court explicitly credited Freeland's testimony and found that the new evidence did not detract from the state courts' findings about Freeland's credibility. This finding is not clearly erroneous.

The dissent would not defer to the state trial court's and district court's findings of fact because "the [state] court did not adequately develop the material facts." *Dissent* at 748; *see also id.* at 748 ("[n]or did the court develop the evidence of the sexual assault and multiple burglaries committed against Freeland, or the serious crimes charged against her several immediate relatives"). Of course, we do not place the onus on the trial court to unearth every bit of evidence that might indicate that a particular juror is biased. Rather, "it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423, 105 S.Ct. at 852; *see also Smith*, 455 U.S. at 215, 102 S.Ct. 940, 944–45, 71 L.Ed.2d 78 (Supreme "Court has long held that the remedy for allegations of juror partiality is a

hearing in which the defendant has the opportunity to prove actual bias"). In fact, added facts were placed before the state trial judge when Dyer moved for a new trial and his counsel filed a declaration, asserting that the killer of Freeland's brother was convicted of voluntary manslaughter. The motion argued, as the dissent does now, that Freeland's "reasoning is simply incredible."

In any event, we are faced with not only state court findings of impartiality, but with district court findings that are based on the additional facts that Dyer has since proffered and on which the dissent focuses its attention. As the district court found, none of these additional facts provides any reason to disturb the state courts' finding that Freeland was honest in her responses. *See Nix v. Williams*, 467 U.S. 431, 449–50, 104 S.Ct. 2501, 2511–12, 81 L.Ed.2d 377 (1984) (newly discovered evidence failed to demonstrate that facts were not adequately developed in state court). Dyer complains that the district court relied only on Freeland's deposition testimony and that no court has confronted her with all of her omissions and determined that she was dishonest. However, none of the district court's findings as to Freeland's credibility is clearly erroneous. Therefore, these additional facts should not destroy the presumption that the state courts' findings of fact are correct. *See Bonin*, 59 F.3d at 823.

b.

■ If the statutory presumption in favor of crediting the trial court's factual findings applies, Dyer argues alternatively that he has presented convincing evidence to rebut the state courts' findings of Freeland's honesty. Although the number of crimes committed by members of her family seems high, and the number of incidents in which she or members of her family were victims of crimes also seems high, these facts above do not establish that Freeland was dishonest. Freeland is apparently from a crime-ridden community—a fact which plausibly both affects her understanding of what qualifies as a crime and influenced her answers to Questions 13 and 15. Both the trial court and state supreme court found that the voir dire

questions were ambiguous and that Freeland's responses at the in camera hearing and at her deposition were honest. *See United States v. Nickell,* 883 F.2d 824, 827 (9th Cir.1989) (where juror's answer is consistent with one interpretation of ambiguous question, there is no basis for finding dishonesty). The record as a whole, including Freeland's deposition testimony and her responses at the in camera hearing, is adequate to support the findings that she was not being dishonest during voir dire. *See McDonough,* 464 U.S. at 556, 104 S.Ct. at 849 ("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.").

The dissent rejects the state court's factual findings as to Freeland's honesty and would instead find that Freeland's responses were "patently implausible." *Dissent* at 745. The dissent's keystone is that "Freeland lied," and that her "blatant lies demonstrate her actual bias." *Id.* at 744–45. But did she lie? Our time-tested judicial system relies heavily on the trial judge to make this determination. Of course, one may assume a fact from the cold, sterile reporter's transcript, but experience has demonstrated that the trial judge, using all the senses (including even voice inflections), is in the best position to determine credibility. All trial judges have had that experience—and appellate judges properly defer to the factual finding of credibility. Indeed, on issues of credibility, we give special deference. *Knaubert,* 791 F.2d at 727.

We, therefore, are unwilling to second-guess the state judge, who had ample opportunity to view Freeland's demeanor and assess her responses. The record certainly supports the trial court's assessment of Freeland's honesty on the subject of her brother's death. The very first question posed to Freeland at the hearing was whether "at any time in the last five or ten years ha[s] any member of [her] family or former member of [her] family, or anyone who was ever related to [her] [been] the victim of a homicide." When asked this different, direct, pointed question, Freeland answered, "Yes, my brother." When asked why this event did

not stop her from answering "no" to Question 13, Freeland's answer was plausible. The dissent would refind the facts and hold that her answer "defie[d] common sense." *Dissent* at 745–46. We, on the other hand, can imagine a number of sensible reasons to explain Freeland's belief. For example, her father may have withheld the truth to protect Freeland, or despite persuasive evidence to the contrary, Freeland may have been willfully blind. But we need not delve into Freeland's psyche. Rather, the trial court saw Freeland testify and simply did not believe that she lied. *See Dennis v. United States,* 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950) ("One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter."). Simply put, while there are substantial questions raised as to her credibility, the findings by the state trial court, added to by the findings of the district judge, have not been demonstrated by Dyer to be clearly erroneous—given the special credibility deference we are required to apply: she believed what she said was true at that time.

### 2.

We add, without extensive elaboration, that there is a second burden placed on Dyer to receive habeas corpus relief on this issue. Dyer must show that a "correct" response would have provided a valid basis for a challenge for cause. *McDonough,* 464 U.S. at 556, 104 S.Ct. at 850. To have the trial court excuse Freeland for cause, Dyer must demonstrate to the trial judge that Freeland could not be a fair juror. That is, regardless of past experience, could she be a fair juror and decide the case on the facts found to be true and the law provided by the court? *See Patton,* 467 U.S. at 1035, 104 S.Ct. at 2890–91 ("The relevant question is ... whether the juror[ ] ... had such fixed opinions that [she] could not judge impartially the guilt of the defendant."); *United States v. Quintero-Barraza,* 78 F.3d 1344, 1349–50 (9th Cir.) (quoting *Patton* ), *cert. denied,* — U.S. —, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996).

The state trial judge found she could. The district court's findings uphold the state court's finding that Freeland could be fair. In effect, these courts found Freeland was "capable and willing to decide the case solely on the evidence" presented. *Smith*, 455 U.S. at 217, 102 S.Ct. at 946. However, this issue was not argued before us, and we take no position on it. Because of our holding in part II.B.1., it is unnecessary for us to consider it.

### C.

■ Dyer also argues that even if Freeland did not withhold information intentionally, we should presume or imply bias based on the circumstances. The Supreme Court has never explicitly held that we may infer or presume bias based on the totality of the circumstances. We are extremely reluctant to do so, and we will presume bias only in the rarest and most extraordinary circumstances. *Tinsley*, 895 F.2d at 527; *see also McDonough*, 464 U.S. at 556–57, 104 S.Ct. at 850–51 (Blackmun, J., concurring); *id.* at 558, 104 S.Ct. at 851 (Brennan, J., concurring).

In only two cases have we held that "bias could be implied or presumed from the 'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships." *Tinsley*, 895 F.2d at 527, *quoting United States v. Allsup*, 566 F.2d 68, 71 (9th Cir.1977). In *Allsup*, we held that two jurors in a bank robbery trial were partial despite their protestations of impartiality and the district court's finding of impartiality. *Allsup* presumed bias because the jurors were employees of a different branch of a bank that was robbed. 566 F.2d at 71. In addition, the jurors' employment relationship with the bank and their "reasonable apprehension of violence" due to the risk of violence from bank robbers created a "substantial probability" that the jurors could not be impartial. *Id.* at 71–72. Similarly, in *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979), a heroin conspiracy trial, a juror did not disclose on voir dire that two of his children were in prison for heroin-related crimes. *Id.* at 516. We presumed that the juror was biased because of his children's involvement with heroin. *Id.* at 517.

Dyer insists that his is an extreme and extraordinary case that requires us to presume bias. He urges us to presume that Freeland was partial because she and so many of her relatives have either been convicted of crimes or been victims. Dyer especially urges a finding of bias because Freeland's brother was shot several times in the head, just as the victims in this case were. We recognize that on rare occasions, "[c]ourts have been willing to presume bias where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern." *Tinsley*, 895 F.2d at 528 (citing cases). However, here we accept the trial court finding that Freeland honestly believed that her brother had been killed accidentally. In addition, we do not believe that one characteristic of the two events—the similar manner of death—renders the case extraordinary or extreme.

We also recognize that, at first glance, it seems extraordinary that Freeland has experienced such tragedies. However, considering the alleged rate of crime in Freeland's neighborhood, her situation as to much of this background is not so surprising or extraordinary. Indeed, Freeland has experienced crime from both sides—as a victim and as the family member of criminals. We cannot say that there was an inherent "potential for substantial emotional involvement, adversely affecting impartiality." *Id.* at 527 (internal quotation omitted). Freeland herself testified that she had forgotten about most of the crimes in her past and that she had "a ton of relatives" who "have done things." Although her brother was killed by a gunshot wound to the head, which she believed was accidental, she also has relatives who have been convicted of crimes. Thus, Dyer has not shown that she would have been biased for or against him. *See Romano v. Oklahoma*, 512 U.S. 1, 11–13, 114 S.Ct. 2004, 2012–13, 129 L.Ed.2d 1 (1994) (*Romano*) (because erroneously admitted evidence could have made jurors more inclined to impose death, or less inclined to impose death, court would not find prejudice based on mere speculation). We therefore will not presume that because Freeland may have associated or lived with people who have committed crimes, or that because she has been a victim

of crimes, she was presumably biased against Dyer.

The dissent would imply bias based on the similarities between Freeland's brother's death and the facts surrounding Dyer's crimes. However, as we explained earlier, we presume that the state court's findings are correct that Freeland did not understand or know the facts surrounding her brother's death when she served as a juror. Thus, even if these circumstances were sufficiently extraordinary to indicate that Freeland might be biased, we would not imply bias where we have already upheld state court findings that show that Freeland was not aware of the similarities.

### III

Dyer next contends that his trial attorney, John Burris, provided ineffective assistance for failing to investigate, obtain, and present evidence of Dyer's use of phencyclidine (PCP) before the murders, Dyer's psychological and social history, and Dyer's organic brain damage. Dyer also argues that Burris failed to investigate the circumstances of his prior robbery conviction and was ineffective at the penalty phase for failing to contest the facts underlying the robbery conviction. Dyer's claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. *McKenna v. McDaniel,* 65 F.3d 1483, 1490 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1451, 134 L.Ed.2d 570 (1996).

To establish that his trial counsel was constitutionally defective, Dyer must demonstrate "(1) that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense." *Bonin,* 59 F.3d at 833 (internal quotations and citations omitted). The ultimate question is whether Burris's "representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (*Strickland*). We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Our review of counsel's performance under *Strickland* is extremely limited:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.

*White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir.1992), *cert. denied,* 514 U.S. 1131, 115 S.Ct. 2008, 131 L.Ed.2d 1008 (1995). Thus, "[w]e will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood,* 18 F.3d 662, 673 (9th Cir.) (en banc), *cert. denied,* 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. A "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066.

To make out a claim, Dyer must establish prejudice, demonstrating that there is a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Bonin,* 59 F.3d at 833 (citations omitted).

### A.

Dyer contends that all of his actions on the night of the murders could have been explained with testimony that Dyer had ingested PCP and that he was prejudiced because Burris failed to investigate and present evidence to this effect. Such evidence, Dyer asserts, would have bolstered his diminished capacity defense and would have amounted to mitigating evidence at the penalty phase that reasonably would have led to a life sentence.

### 1.

Dyer argues that Burris's investigation into Dyer's possible ingestion of PCP was inadequate. Dyer has now come forward with depositions from three witnesses—Sandra Collins, Roger Dismuke, and Charles Howard—who say they saw Dyer smoke "sherm" (a street name for cigarettes laced with PCP) at Dismuke's party on the night of the murders. In addition, Dr. Yago, the defense expert at Dyer's trial who discussed the general effects of cocaine, heroin, amphetamines, methamphetamines, and combinations of these drugs, such as speedballs, now asserts that had she known that Dyer may have ingested PCP, she would have testified differently. Dr. Yago now contends that Dyer's ingestion of PCP on the night of the murders "could explain" his alleged cognitive impairments and memory lapses.

Despite the medical evidence that Dyer now proffers, and despite the depositions of witnesses who now testify that he smoked "sherm," we cannot say that Burris's investigation was constitutionally ineffective. Burris stated that he knew that some of those attending Dismuke's party had smoked sherm because Dyer knew and told him that PCP was being used at the party. However, Dyer never told Burris that he had smoked sherm. None of the doctors who interviewed or examined Dyer before trial indicated that Dyer had admitted smoking sherm. In fact, no one with whom Burris or his assistants spoke stated that Dyer had mentioned smoking PCP-laced cigarettes.

Despite the lack of credible or corroborating evidence that Dyer himself ingested PCP, Burris stated that he explored the possibility that Dyer had consumed that drug in addition to the others. Burris sent an investigator to interview Dismuke. He informed the investigator that Dyer "consumed alcohol and smoked marijuana or dope at [Dismuke's] home." Burris testified that he "would consider smoking a sherm as dope." Although the investigator failed to locate Dismuke, Burris's law clerk eventually found her. Based on the clerk's interview, which may or may not have included a discussion of PCP, Burris decided not to interview Dis-

muke further and decided not to call her to testify.

Based on the evidence before us, we cannot say that Burris's investigation was inadequate. Although he knew that PCP was consumed at Dismuke's party, Burris had no credible evidence from Dyer or anyone else that Dyer himself had ingested PCP. No expert at the time of trial associated Dyer's behavior with possible ingestion of PCP. Thus, simply because Burris was aware of possible PCP use but did not attempt to have witnesses interviewed or locate additional evidence that would corroborate his suspicions, his investigation was not deficient. Even if Burris was not fully educated as to the subtle differences between the effects of PCP and the effects of other drugs, this lack of knowledge is irrelevant. It was the lack of credible evidence that led Burris to the decision not to pursue Dyer's possible PCP use. *See Wade v. Calderon,* 29 F.3d 1312, 1318–19 (9th Cir.1994) *(Wade)* (not ineffective assistance where counsel decided not to present evidence of petitioner's possible PCP use because of lack of evidence and because of his belief that jury would use such evidence only in aggravation), *cert. denied,* 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

Because Burris, after a reasonable initial investigation, was unable to locate credible evidence that would have supported a PCP theory, his tactical decision not to investigate further was also reasonable. *See Hensley v. Crist,* 67 F.3d 181, 185 (9th Cir.1995) *(Hensley)* ("Tactical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel."); *Wade,* 29 F.3d at 1319. Rather, "the wholly unremarkable fact [is] that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel." *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.) (en banc) *(Waters ), cert. denied,* —— U.S. ——, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995). The fact that Dyer can now proffer evidence that he ingested PCP does not change the tactical nature of Burris's reasonable decision to utilize his limited resources elsewhere.

For the same reasons, Burris's failure to present evidence of PCP use at the penalty stage was also reasonable. Because the jury rejected his diminished-capacity defense at trial, Burris reasonably decided to present a positive portrait of Dyer at the penalty phase. Burris wanted to downplay the influence of drugs in order to avoid suggesting that Dyer acted totally irresponsibly. This decision was tactical and reasonable.

### 2.

Even assuming that Burris's initial investigation into Dyer's ingestion of PCP was inadequate, Dyer has not proved that he was prejudiced by such an error. It is not reasonably probable that the outcome of Dyer's trial would have been different had Burris investigated further.

First, Dyer has failed to show that had Burris investigated, he would have uncovered credible evidence that would have strengthened Dyer's case. The present cooperation of Roger Dismuke and Howard is in bold contrast with their response at trial. Roger Dismuke indicated at the time of trial that he would not testify on Dyer's behalf. Burris's law clerk did contact Howard, who at the time agreed to keep Burris informed of any helpful information. Dyer has not shown that had Burris investigated Howard further, Howard would have revealed anything that might have helped Dyer at trial. In addition, at the time of the offense, Collins was fifteen, and it has not been demonstrated that Dyer's case would have been strengthened had a fifteen-year-old testified that Dyer shared PCP-laced cigarettes with her. Furthermore, testimony from the witnesses would have revealed additional inconsistencies. Collins, Howard, and Roger Dismuke disagree as to whether Dyer knew he was smoking PCP. They also disagree as to whether sherm has a distinctive smell that would alert a smoker as to what he was smoking.

The dissent points to a list of additional witnesses, including Dyer himself who, if investigated and called to testify, together would have established that Dyer used PCP. *Dissent* at 750–52. However, there is no indication that Dyer remembered taking PCP; thus, he could not and did not testify to having done so. Dr. David Smith's testimony at the district court's evidentiary hearing does not reliably indicate that Dyer ingested PCP. *Compare id.* Rather, Dr. Smith ambiguously testified that Dyer may have told him that "he thought he had taken—gotten PCP some way or another." In fact, Burris testified at the district court's evidentiary hearing that "[t]he reason why I didn't follow up with [Dr. Smith] is because he told me that he did not think that I had a very good case in order to build a diminished capacity defense around the drugs that [ ] Mr. Dyer had taken." Thus, even if Dr. Smith were aware that Dyer may have ingested PCP, he did not believe that it was strategically wise to rely on a diminished capacity defense. Burris disagreed and sought another opinion. Dyer has not shown that had Burris pushed Dr. Smith, Smith would have changed his opinion as to proper trial strategy and would have emphasized that Dyer may have ingested PCP. Furthermore, like Roger Dismuke and Howard, Delphine Dismuke was less than cooperative when Burris's law clerk interviewed her. Even presuming that she would have cooperated had Burris investigated further, her testimony would have contradicted the testimony from Howard and Collins. Delphine Dismuke testified at the evidentiary hearing that Dyer was uncharacteristically aggressive, while Howard and Collins noticed nothing unusual.

Second, not only would further investigation have proved futile, but the evidence Dyer now proffers regarding the effects of PCP are mostly cumulative of the effects of the other drugs that he did admit to consuming. *See United States v. Schaflander,* 743 F.2d 714, 718–19 (9th Cir.1984) (*Schaflander*) (failure to present cumulative testimony does not show prejudicial ineffective assistance), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Dr. Yago's declaration catalogs the range of physical and psychological effects of PCP:

Physical effects can include pupillary constriction, blurred vision, increased blood pressure and heart rate, sweating, nausea, and vomiting. PCP can cause depersonali-

zation (feeling as if watching oneself from outside), agitation, disorganization of thought processes, visual and auditory distortions, intense feelings of alienation and paranoia, catatonic rigidity, mutism, and acute psychosis.

In addition, Dr. Yago now explains that a person intoxicated with PCP may engage in a series of acts without judgment or reasoning, may engage in psychotic behavior, and may engage in random, detached, inappropriate violent acts. She states that PCP "could explain" Dyer's ability to sleep for a short period despite ingesting numerous stimulants and that it "could explain" his partial amnesia and goal-oriented behavior.

At trial, Dr. Yago testified that many of these same effects could have been caused by cocaine, heroin, amphetamines, methamphetamines, or a combination of these substances. Cocaine, she testified, can cause increased blood pressure, an increased heart rate, a sense of being hot, "a feeling as if one wants to move around, being more active, pacing back and forth, anxious," flu-like symptoms, confusion, irrational paranoia, and extreme violence. She testified that heroin is a sedative that can cause a person to "nod off." Amphetamines, she testified, can cause paranoia, confusion, disorientation, impaired perception, delirium, and memory loss. She testified that combining drugs can cause auditory and visual distortions, spontaneous aggression, and temporary periods of deep sleep. Dr. Yago also testified that what could appear as goal-oriented behavior could actually be based on psychotic thought processes.

At most, then, had Dr. Yago known that Dyer may have ingested PCP, and had Burris been able to produce credible evidence that Dyer had ingested PCP, Dr. Yago might have been better able to account for Dyer's goal-oriented behavior and selective memory loss. Not only has Dyer failed to show that evidence of his alleged PCP use should have been uncovered, but he has failed to demonstrate that a fuller account of his alleged behavior would have led to a different result. Thus, Burris's failure to investigate and discover evidence that Dyer used PCP, and his

failure to present such evidence to Dr. Yago for her analysis, did not prejudice Dyer.

### B.

 Next, Dyer alleges that Burris was ineffective for failing to investigate, obtain, and present additional evidence of Dyer's psychological and social history. Dyer catalogs a number of facts about his past that Burris failed to discover and argues that Burris's mitigation case was therefore unconstitutionally inadequate.

We have held defense counsel's performance ineffective where counsel presents absolutely no mitigating evidence in a case where substantial evidence was available. *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). However, counsel's decision not to conduct a particular investigation does not render performance defective where the decision is reasonably justifiable. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066–67. We have never held that counsel has a duty to uncover every aspect of a defendant's past and to present all evidence that might bolster a defendant's mitigation case. Rather, trial counsel's resources are limited and the strategic decision to emphasize certain aspects of a defendant's background at the expense of investigating others is both reasonable and wholly acceptable. *See Waters*, 46 F.3d at 1514.

Here, Burris did present substantial evidence of Dyer's psychological and social history. Dr. Hilliard conducted psychological tests, interviewed Dyer three times, and interviewed Dyer's mother and co-workers. Dr. Hilliard, Dyer's mother, and two co-workers all testified during the penalty phase. Dr. Hilliard obtained a complete history in which he traced Dyer's development from birth until the time of the murders. As the district court recognized, the jury heard, among other things, that Dyer was well-behaved, nonviolent, and a peacemaker; that he helped his mother around the house from a very young age and enjoyed skating and boxing; that he stammered, had academic difficulties, and was teased as a child; that his mother was only fifteen when he was born and that she relocated without him on

two occasions; that he grew up in overcrowded housing projects with his grandmother and had no father figure; and that he felt remorse about the offense.

Dyer's newly proffered evidence, largely cumulative of the information that was actually presented to the jury, does not establish Burris's ineffectiveness. *Schaflander*, 743 F.2d at 718. The prosecution did not challenge any of the background information Burris presented, and Burris did not believe that it was necessary to present additional evidence. This was a reasonable tactical decision. *See Hensley*, 67 F.3d at 185; *Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir.1995) ("counsel is not required indiscriminately to present evidence"), *cert. denied*, —— U.S. ——, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996).

### C.

■ Dyer also contends that Burris was ineffective for failing to investigate and present evidence that Dyer suffers from organic brain damage. The record indicates that Dyer told Burris that he had been in a car accident six to eight weeks before the offense. Burris also knew that Dyer had hit his head in this accident and had been hospitalized. Burris reviewed Dyer's hospital records and had his hospital x-rays reviewed by Dr. Ramona Toscoe, who indicated that there was no apparent structural damage.

The record also indicates that Burris knew that Dyer had been hit on the head with a bottle as a small boy and that Dyer had boxed for a number of years. Burris had Drs. Yago, Hilliard, and Smith examine Dyer. Dr. Yago conducted a psychiatric evaluation and Dr. Hilliard performed psychological tests. None of their reports indicated that Dyer suffered from brain damage.

Dyer essentially argues Burris was ineffective for failing to hire a neurologist or neuropsychologist to conduct further examinations and tests. But Burris conducted no further investigation into possible brain damage because, after examining hospital records and x-rays, Dr. Toscoe discovered no structural abnormality. Burris was entitled to rely on the assessments of Drs. Toscoe, Hilliard, Yago, and Smith, *see Hendricks v. Cal-*

*deron*, 70 F.3d 1032, 1039 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996), and his decision to focus his efforts elsewhere was also reasonable.

### D.

■ Dyer contends that Burris was ineffective for failing to consider the possibility that a penalty-phase stipulation to a firearm enhancement could be used as evidence in aggravation.

Before trial, Dyer admitted that he had been convicted in 1972 and 1973 for burglary and in 1975 for first degree robbery. The prosecutor later agreed that he would not use these prior convictions during the guilt phase to impeach Dyer or any character witnesses.

At the penalty phase, Burris stipulated to these prior convictions. Based on this stipulation, and over Burris's objection, the jury was instructed that Dyer had been convicted of two other prior convictions and of armed robbery with the use of a firearm. Burris argued that the stipulation, as far as he was concerned, was not meant to allow the prosecution a basis to argue that Dyer's use of a firearm is evidence of violence. However, the prosecution referred to the armed robbery conviction to illustrate Dyer's pattern of increasing violence. Dyer has now proffered evidence that indicates that he did not use a gun in the robbery and argues that Burris's stipulation rendered his assistance constitutionally defective.

Initially, Burris believed that Dyer's diminished capacity defense would be successful and thought that there was a good chance that Dyer would be convicted of less than first-degree murder. His focus was on keeping the convictions out the guilt phase of the trial. When he entered the stipulation, Burris did not consider the ramifications of the pretrial stipulation for the penalty phase. Burris's initial focus on the guilt phase did not render his performance ineffective. Rather, "[t]he choice to pursue a particular strategy in one phase at the cost of lowering the likelihood of success in the other phase is a tactical decision for which there is no cor-

rect answer, but only second guesses." *Id.* at 1041.

At the penalty phase, Burris's tactic was to present Dyer as a decent person. Burris testified that he could have called the victim of the armed robbery to testify, but that doing so would have undercut his strategy. Indeed, had Burris not stipulated to the use of the firearm, the prosecution also could have called the victim of the robbery to the stand to testify. Wanting to avoid this potentially damaging testimony, Burris's stipulation was reasonable.

## IV

Dyer also contends that the jury was improperly instructed on the elements of aiding and abetting and that the erroneous instruction amounted to constitutional error. The jury was instructed that Dyer could be convicted of murder if he intentionally aided or abetted its commission or intentionally advised and encouraged its commission "with knowledge of the unlawful purpose of the person who directly and actively commit[ted] ... the crime." This jury instruction has been held to be constitutionally deficient in *People v. Beeman,* 35 Cal.3d 547, 550–51, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984), because the instruction did not require that Dyer act with the specific intent of aiding the principal's crime. *See California v. Roy,* —— U.S. ——, ——, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996) (*Roy* ); *Martinez v. Borg,* 937 F.2d 422, 423 (9th Cir.1991).

In *Roy,* the Supreme Court held that the harmless error standard of *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (*Brecht* ), applies to collateral review of *Beeman* error. *Roy,* —— U.S. at —— – ——, 117 S.Ct. at 338–39. Under this standard, we must ask "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 637, 113 S.Ct. at 1722, *quoting Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946).

The jury convicted Dyer of four counts of kidnapping, two counts of attempted murder (Bennie Warren and Belinda Murray), and two counts of first degree murder (Nora Fluker and Floyd Murray). The jury also found that Dyer personally and intentionally inflicted great bodily injury on Fluker and Warren, but that he did not personally inflict great bodily injury on Floyd or Belinda Murray. To convict Dyer of attempted first degree murder of Belinda Murray and Warren, the jury must have found a specific intent to kill. Thus, the *Beeman* error did not affect these convictions.

As to Fluker, the jury found that Dyer, armed with a .45 caliber semiautomatic pistol, specifically intended to inflict great bodily injury on her and did, in fact, do so. Dyer argues that these findings do not necessarily indicate that he acted with the specific intent to kill Fluker, so that the jury may have rested its conviction on the infirm aiding and abetting instruction. Both the district court and California Supreme Court held that the jury necessarily found that Dyer "personally murdered" Fluker, so that the erroneous instruction played no role in the jury's findings.

Although it is theoretically possible for a jury to return a special verdict of specific intent to do great bodily injury without finding a specific intent to kill, *see People v. Ratliff,* 41 Cal.3d 675, 695, 224 Cal.Rptr. 705, 715 P.2d 665 (1986) (fact that defendant shot victims at close range may have demonstrated intent to disable but, without more, did not establish intent to kill), absolutely no evidence in the record supports this possibility. While Fluker's autopsy revealed that at least one of the bullets found in her body was from a .38 caliber revolver, Dyer stood over Fluker's body with a .45 and shot her at least once. The jury specifically found that Dyer intended to kill Warren and Belinda Murray, who were lying next to Fluker. No evidence in the record could support a finding that Dyer intended to kill Warren and Belinda, but intended only to injure Fluker.

Because the jury found Dyer not guilty of inflicting great bodily harm on Floyd Murray, the jury implicitly found Dyer guilty of murdering him under the infirm aiding and abetting instruction. The prosecutor specifically asked the jury to convict Dyer of murdering Floyd Murray based on an aiding and

abetting theory because the bullets removed from Floyd Murray came from a .38 caliber weapon, and there was no evidence that Dyer himself fired that gun. However, no evidence supports a finding that Dyer lacked the specific criminal intent to assist in Floyd's murder. The California Supreme Court's explanation of what a rational jury must have found is relevant to our inquiry:

> The evidence, coupled with the jury's findings, showed that [Dyer] (1) intentionally assisted in kidnapping Belinda, Bennie, Nora and Floyd; (2) joined in ordering the four victims into and out of the car and onto the ground; (3) personally and intentionally inflicted great bodily injury upon Bennie and Nora; (4) attempted to murder Bennie by shooting him in the head; and (5) murdered Nora by firing [at least one] shot from a .45 caliber revolver into her body at close range. In addition, Ario had told [Dyer] at the apartment that, "if you kill one, you have to kill them all" and [Dyer] replied he would not kill the babies. We must reject [Dyer's] theory that, under the facts of this case, a properly instructed jury could have found he intended to kill Bennie, Belinda, and Nora but not Floyd.

*Dyer*, 45 Cal.3d at 65, 246 Cal.Rptr. 209, 753 P.2d 1. The evidence cannot support a finding that Dyer lacked the specific intent to assist Jackson in killing Floyd Murray; thus, we hold the error harmless under *Brecht*.

### V

Dyer next contends that he suffered prejudice from two ex parte contacts—one among certain jurors and a prosecution witness and one among certain jurors and the trial judge.

First, Dyer complains of contact among a prosecution witness and three jurors. Dyer has presented the testimony of Rick Bartholomew, foreperson of the jury in Dyer's trial, who says that he and two unidentified female jurors walked by Warren as they were leaving the courthouse one day during Dyer's trial. Bartholomew testified that Warren "said something to the effect of 'Hang him,'" and that the jurors may have responded, "Don't talk to us." None of the jurors who encountered Warren discussed the encounter with anyone else.

We assume without deciding that this brief, unreported exchange amounted to jury misconduct. The presumed error is trial error, *Thompson v. Borg*, 74 F.3d 1571, 1574 (9th Cir.) (*Borg*), *cert. denied*, ― U.S. ―, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996), and is subject to harmless-error review. *Brecht*, 507 U.S. at 638, 113 S.Ct. at 1722. We ask whether Warren's statement had a substantial and injurious effect on the outcome. *Borg*, 74 F.3d at 1574; *see also Lee v. Marshall*, 42 F.3d 1296, 1298 (9th Cir.1994) (ruling that contact between jurors and police officers, where nothing substantive is said, is analyzed under *Brecht* for harmlessness).

Applying *Brecht*, it is clear that the type of error that occurred did not have a substantial and injurious effect on Dyer's trial or sentence. One of Dyer's victims, a key prosecution witness, told three jurors to hang Dyer. At the time of the encounter, the jurors had already heard Warren's testimony, and it is safe to say that they were not surprised to hear that Warren, having been shot in the head by Dyer at point-blank range, would not have been too sympathetic to Dyer's plight.

Contrary to the arguments of both Dyer and the dissent, the cases that they cite involve communications that were far more damaging and of a different nature than the one here. In *Stockton v. Commonwealth of Virginia*, 852 F.2d 740 (4th Cir.1988) (*Stockton*), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), Puckett, the owner of a diner, conversed with jurors who were eating lunch at his restaurant. In the course of the conversation, he told several jurors that "they ought to fry the son of a bitch." *Id.* at 742. Puckett, unlike Warren, was neither a victim nor a witness. Puckett's encounter with the jurors was far longer than the few words exchanged among Warren and the jurors. Puckett "inquired whether they had reached a decision," *id.*, and one juror even responded to him "that they had all decided except for 'one damned woman.'" *Id.* In addition, *Stockton* was a habeas corpus case decided before *Brecht*. The court, applying a rule that is not the law of our circuit, *see Lawson v. Borg*, 60 F.3d

608, 612 (9th Cir.1995), presumed prejudice from the encounter.

*Lawson* involved one juror obtaining and conveying to other jurors information about the defendant's violent reputation. In *Lawson,* the juror obtained "extrinsic information directly relat[ing] to a material issue in the case." *Id.* We held that the receipt of this information had a substantial and injurious effect on the outcome. In contrast, Warren provided the jurors with his own opinion, which bore no factual relevance to the outcome. *See United States v. Endicott,* 869 F.2d 452, 457 (9th Cir.1989) (juror approaches main prosecution witness and says that he knows defendant is guilty; ex parte contact held not prejudicial). Likewise, *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir. 1988), decided before *Brecht,* involved a highly prejudicial statement bearing on the petitioner's recidivism. A deputy told the jury "that Dickson had done 'something like this before.'" *Id.* at 408. *Dickson* followed a line of cases in which we have held that extrinsic evidence of prior criminal acts is highly prejudicial. *Id.* Warren's emotional outburst can hardly be called "extrinsic evidence" of prior criminal acts.

*United States v. Maree,* 934 F.2d 196 (9th Cir.1991), also decided before *Brecht,* does not alter the outcome of this case. *Maree,* a direct appeal, applied a stricter standard of review. *Id.* at 201 ("defendant will receive a new trial only if the court finds 'actual prejudice' to the defendant"). Also in *Maree,* the juror testified that she changed her vote to guilty because two of her friends (not on the jury) told her to do so. *Id.* at 198–99 n. 2. Nothing in the record suggests that Warren's statement rose to this level of prejudice.

■■■ Dyer also contends that he suffered prejudice from a contact among at least two jurors and the trial judge. These two jurors indicated that at some point, the judge saw them in a restaurant and said something to them. Both the nature of the comment and the date of the encounter are unclear.

Bartholomew testified that the judge "commended us for work well done, and he brought a fellow with us to explain that he can't speak to us singularly or alone and that

he was the 13th juror, in essence, and he had to go and review and that's why he couldn't really socialize." Bartholomew also testified, "I think he made reference to he could change [the verdict] if he thought we were in error." Another juror, Alfonsa Carney, testified that "all I recall [the trial judge] saying is that ... we were good jurors, that we listened to the evidence and that kind of thing. He said we were good jurors, we listened intensively. He said in his opinion we listened real good to the evidence. He just had a brief conversation."

Bartholomew testified that he was "not real sure" when it took place. He testified that it may have occurred between the guilt and penalty phases, but that it also may have been "at the end of the trial." Carney testified that "we had no contact with him when we sat as jurors," but also that the contact may have been between the guilt and penalty phases.

Dyer argues that the trial judge's statements diminished the jury's sentencing responsibility and amounted to error under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell,* the prosecutor urged the jury not to view itself as finally determining whether the defendant would die, because a death sentence would be reviewed for correctness by the state supreme court. *Caldwell* held, on direct appeal, that the prosecutor's statement amounted to reversible error because "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. at 2639.

Neither Bartholomew's nor Carney's testimony indicates exactly when the conversation took place. The judge's statements that they were "good jurors" and his commendation for "work well done" suggests that the contacts occurred after the trial. Furthermore, after reading the testimony of both Bartholomew and Carney, we conclude that the trial judge did not say anything that could have prejudiced Dyer. Taking both jurors' memories of the events together, and

assuming that the contact occurred during the guilt or during the sentencing phase, it appears that the judge was simply attempting to avoid any prolonged contact without appearing rude. As the district court quoted from one of our cases, we will "not presume prejudice where a court or its staff show[s] courtesy to citizens serving as jurors." *United States v. Velasquez–Carbona*, 991 F.2d 574, 576 (9th Cir.), *cert. denied*, 508 U.S. 979, 113 S.Ct. 2982, 125 L.Ed.2d 678 (1993); *see also Rushen v. Spain*, 464 U.S. 114, 118, 104 S.Ct. 453, 455–56, 78 L.Ed.2d 267 (1983) ("There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."). The nature of the judge's comments do not suggest that the jury could have been misled as to the gravity of their responsibility. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1108 (9th Cir.1992) (*Hendricks*). Rather, if said before Dyer was actually sentenced, the judge's comments merely emphasized the importance of listening closely to the evidence. The comments did not strip from the jury a sense of responsibility for the gravity of their task. We will not overturn Dyer's conviction collaterally based on speculation as to the nature of the ex parte communication and the time at which it occurred. *See Romano*, 512 U.S. at 12–15, 114 S.Ct. at 2012–13.

The dissent cites *Driscoll v. Delo*, 71 F.3d 701 (8th Cir.1995) (*Driscoll*), *cert. denied*, — U.S. ——, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996), to show that the "thirteenth juror" communication in this case substantially and injuriously affected the jury's deliberations under *Brecht*. *Dissent* at 757–58. Yet in *Driscoll*, the prosecutor told the jury several times that it simply "recommended" a death sentence, while the judge made the ultimate decision:

> [J]uries don't sentence people to death in Missouri.... The Judge has a vote. It's really thirteen votes. But the Judge's vote is a veto vote. It doesn't matter whether you return a recommendation for the death penalty.

*Driscoll*, 71 F.3d at 711–12 n. 8. While the judge in this case communicated that he was the "thirteenth juror," he did so to explain why he could not socialize with the jurors. This "thirteenth juror" statement differs greatly from that in *Driscoll*, where the prosecutor called the judge a "thirteenth juror" only to make it easier for the jury to sentence Driscoll to death. The communication in the restaurant in no way "told the jury that it could defer the extremely difficult decision of whether or not [Dyer] should be sentenced to death." *Id.* at 713.

In any event, we hold that any prejudice that could have occurred as a result of the judge's statement was avoided by the trial court's instruction at the penalty phase. The judge specifically instructed the jury to base its sentence only on the evidence presented and that it was to disregard anything he had done or said that may have influenced its decision in any way. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1461 (9th Cir.1987) (no prejudice where curative instruction given), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988); *United States v. Madrid*, 842 F.2d 1090, 1095 (9th Cir.) (error harmless where, among other instructions, judge instructed jury to base decision only on evidence in the case), *cert. denied*, 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256 (1988). Therefore, the judge's contact with several jurors did not have a substantial and injurious effect on the outcome.

## VI

Dyer also argues that numerous errors at the sentencing phase tainted his death sentence. He contends that the penalty-phase instructions impermissibly influenced and limited the evidence that the jury could consider in mitigation. He also insists that the instructions impermissibly permitted the jury to consider nonstatutory aggravating factors. Finally, Dyer argues that the district court improperly excluded evidence of the sentences of his codefendants.

### A.

Dyer presents four challenges to his penalty-phase instructions, contending that they were misleading and that there was a reasonable likelihood that the instructions prevent-

ed the jury from considering relevant mitigating evidence.

The trial court listed the statutory mitigating circumstances and instructed the jury to consider the listed factors, if applicable. First, Dyer argues that these instructions unconstitutionally enabled the jury to transform lack of mitigation into aggravation weighing in favor of death. As Dyer acknowledges, an identical argument was recently rejected in *Williams v. Calderon*, 52 F.3d 1465, 1482 (9th Cir.1995) (*Williams*), cert. denied, —— U.S. ——, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996), and *Bonin*, 59 F.3d at 848. In *Bonin*, we rejected *Bonin's* claim that the jury's penalty-phase instructions "allowed the juries to consider the absence of numerous possible mitigating circumstances to be aggravating circumstances." 59 F.3d at 848. We held that "[t]he cautionary words 'if applicable' [which were in both *Dyer's* and *Bonin's* instructions] warned the jury that not all of the factors would be relevant and that the absence of a factor made it inapplicable rather than an aggravating factor." *Id.* *Dyer's* claim is therefore meritless.

Second, Dyer argues that one of the statutory mitigating factors, which allowed the jury to consider "whether or not" Dyer was "under the influence of extreme mental or emotional disturbance," may have prevented the jury from considering Dyer's emotional condition as mitigating evidence, if that disturbance was less than "extreme." The same argument was rejected in *Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990), and *Hendricks*, 974 F.2d at 1109. In *Blystone*, petitioner argued that an instruction that permitted the jury to consider " 'extreme' mental or emotional disturbance" impermissibly precluded the jury's consideration of less degrees of disturbance, impairment, or duress. 494 U.S. at 308, 110 S.Ct. at 1084. The Court rejected the claim because the jury was not prevented from considering relevant mitigating evidence. *Blystone* cannot be distinguished here.

Third, Dyer argues that the "catch-all" factor, permitting the jury to consider "any other circumstance which extenuates the gravity of the crime," impermissibly limited the jury's consideration of mitigating evidence to matters having to do with the crime itself. He argues that the jury may not have considered any mitigating evidence about his background, psychological make up, and work history. Again, the Supreme Court has rejected an identical argument. *Boyde v. California*, 494 U.S. 370, 381, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) (analyzing identical CALJIC instruction, holding there was no "reasonable likelihood that ... jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character").

■ Fourth, Dyer argues that another statutory factor, "whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was impaired as a result of mental disease or defect, or the effects of intoxication," may have prevented the jury from considering evidence of intoxication because the jury had found that the evidence was not sufficient to prove diminished capacity. Dyer contends that the jury may have been confused because of some similarity between the guilt-phase and penalty-phase instructions. However, the guilt phase required "substantial impairment," while the penalty phase required mere "impairment." Dyer cannot show that there was a reasonable likelihood that the jury applied the instruction in a manner that precluded consideration of relevant mitigating evidence. *Id.* at 380, 110 S.Ct. at 1197–98. It is particularly strained to assert that because the jurors rejected a diminished capacity defense, they believed they could not consider any evidence of intoxication in mitigation.

**B.**

■ Dyer also argues that the instruction defining "aggravating circumstance" allowed the jury to consider nonstatutory aggravating factors. We are bound by the California Supreme Court's determination that there had been no violation of state law. *Dyer*, 45 Cal.3d at 77–78, 246 Cal.Rptr. 209, 753 P.2d 1; *see Williams*, 52 F.3d at 1480–81; *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991) ("it is not

the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Because the error Dyer alleges involves no independent violation of his constitutional rights, *see Barclay v. Florida,* 463 U.S. 939, 956, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983) (nothing in Constitution prohibits consideration of non-statutory aggravating factor); *Harris v. Pulley,* 692 F.2d 1189, 1193–94 (9th Cir.1982) (*Harris*) (rejecting argument that California death penalty statute is unconstitutional because it places no limit on introduction of aggravating factors), *rev'd on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), his argument fails. We also reject as meritless Dyer's claim that California's statute is unconstitutional because it does not require written findings as to the aggravating and mitigating factors on which the jury relied. *Harris,* 692 F.2d at 1195–96 (rejecting identical claim).

### C.

■ Dyer contends that at sentencing he was entitled to have the jury hear that his codefendants were sentenced to life in prison. The Supreme Court has acknowledged that such evidence can be mitigating. *Parker v. Dugger,* 498 U.S. 308, 315, 111 S.Ct. 731, 736, 112 L.Ed.2d 812 (1991). However, it does not follow that such evidence is relevant mitigating evidence in all cases. Nor does it follow that Dyer had a constitutional right to have the jury hear such evidence. Rather, a state court is free to exclude as irrelevant "evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett v. Ohio,* 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978) (plurality). Evidence of Dyer's codefendants' sentences does not relate to his personal background or to the circumstances of the murders. The trial court held that evidence of Dyer's codefendants' sentences was irrelevant, and we will not overturn this evidentiary ruling. The "Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." *Romano,* 512 U.S. at 11, 114 S.Ct. at 2011.

### VII

Dyer next argues that he suffered prejudice from two of the district court's evidentiary rulings. We review the district court's evidentiary rulings for an abuse of discretion, and we will not reverse unless they prejudiced Dyer. *See Bonin,* 59 F.3d at 838.

### A.

■ Approximately one year before the district court conducted its evidentiary hearing, Dyer deposed juror Freeland for an entire day. Although the district court decided that it would hear Freeland's testimony at the evidentiary hearing, Dyer was unable to serve her with a subpoena. The district court ultimately reviewed Freeland's deposition and denied Dyer's habeas petition without hearing Freeland testify. Dyer contends that because the district court did not view Freeland's demeanor, its decision regarding Freeland's credibility was unreliable as the decision was not based on a complete record. Dyer does not contend that Freeland would have presented any evidence in addition to what she presented in her deposition. He merely alleges that his rights were infringed because the district court did not actually observe Freeland.

■ We analyze the district court's discretionary decision to deny a continuance by weighing various factors on a case-by-case basis. *United States v. Mejia,* 69 F.3d 309, 314–15 & 314 n. 5 (9th Cir.1995) (*Mejia*). Although we have used two somewhat different sets of factors in different contexts, *id.* at 314 n. 5, the outcome in this case would be the same under either set. We consider:

(1) the extent of [petitioner's] diligence in his efforts to ready his defense prior to the date set for hearing; (2) how likely it is that the need for a continuance could have been met if the continuance had been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party, including witnesses; (4) the extent to which the appellant might have suffered harm as a result of the district court's denial.

*Id.* at 314 (ellipses omitted), *quoting United States v. Flynt,* 756 F.2d 1352, 1359 (9th Cir.) (*Flynt*), *amended,* 764 F.2d 675 (9th Cir. 1985). The weight accorded to each factor may vary from case to case; but, "in order to obtain a reversal, appellant must show at a minimum that he has suffered prejudice as a result of the denial of his request." *Flynt,* 756 F.2d at 1359.

We initially discuss the first two factors. Dyer made numerous attempts to serve Freeland with a subpoena. Freeland was at home or in her neighborhood during the time Dyer attempted to serve her, yet Dyer was unsuccessful on 21 occasions. The attorney general gave Freeland's telephone number and address to Dyer. After Dyer informed the district court that he was having difficulty actually serving Freeland, the court issued a memorandum advising Dyer's counsel to "continue their efforts to serve Ms. Freeland with a subpoena if they desire to present her testimony live, in lieu of by deposition." By the third and final day of the evidentiary hearing, Dyer still had not served Freeland.

Dyer's inability to locate Freeland, combined with his inability to tell the district court when he would be able to find her, rendered the district court's decision reasonable. *Cf. Mejia,* 69 F.3d at 314, 318–19 (holding refusal to continue evidentiary hearing was abuse of discretion where, among other things, absent government witnesses were on vacation and would be available to testify in two business days). Thus, although Dyer made numerous unsuccessful attempts to serve Freeland, he could not establish that a continuance would have served any purpose. The first factor weighs in Dyer's favor, but the second factor weighs heavily against him.

In addition, the third factor weighs against Dyer. The district court would have been inconvenienced by the indefinite continuance necessary to allow Dyer to locate Freeland. Moreover, there is evidence that Dyer's counsel had been harassing Freeland.

Finally, the fourth factor weighs against Dyer because he has not demonstrated that the district court's refusal to continue the hearing prejudiced him. This case is wholly unlike *Mejia* because the district court here,

unlike in *Mejia,* relied, in addition to the substance of Freeland's deposition, on the state court's own assessment of Freeland's credibility.

It was therefore within the discretion of the district court to refuse to continue an evidentiary hearing.

### B.

▮ The district court issued an order in which it clarified the evidence on which it relied in denying Dyer's petition. Dyer challenges the district court's decision to exclude as irrelevant six declarations pertaining to his behavior in prison pending trial and to the degree of his remorse. The court did not abuse its discretion in holding that these declarations were irrelevant.

Dyer's ineffectiveness of counsel claims do not allege ineffectiveness for failing to investigate or present evidence of his behavior in jail or the degree of his remorse. Thus, the declarations were properly excluded as irrelevant.

### VIII

Finally, Dyer argues that even if the alleged errors did not individually have a substantial and injurious effect on the outcome of his trial or sentence, the cumulative effect of the errors did amount to constitutional error. Although errors did occur in Dyer's trial, neither all of them individually, nor all of them together, had a substantial and injurious effect on the outcome at either the guilt or penalty phase. Dyer is asking us "to add a group of negative numbers together and find that the sum is positive," *Fairchild v. Lockhart,* 979 F.2d 636, 639 (8th Cir.1992), *cert. denied,* 509 U.S. 928, 113 S.Ct. 3051, 125 L.Ed.2d 735 (1993), and we will not do so.

AFFIRMED.

FLETCHER, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion. Alfred R. Dyer is entitled to a new trial. Despite revulsion at the hideous and senseless killings that took place in this case, we cannot abdicate our duty to examine the petitioner's trial dispassionately to determine

whether he received a fair trial. The judgment we render has ramifications beyond the fate of one individual. It affects how justice will be rendered in California and the Ninth Circuit and possibly more broadly.

Because serious defects in his trial deprived Dyer of the fair trial guaranteed him by the United States Constitution, I respectfully but vigorously dissent from the majority's decision to affirm the district court's denial of Dyer's petition for a writ of habeas corpus.

## I. THE BIASED JUROR

Trial by fair and impartial fact finders is the heart of what we claim justice in America is all about. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 179, 81 L.Ed. 78 (1936). "Doubts regarding juror bias must be resolved against the juror." *Burton v. Johnson,* 948 F.2d 1150, 1158 (10th Cir.1991).

The presence of Jessica Freeland on Dyer's jury deprived Dyer of his constitutional right to trial by an unbiased jury. We should hold that both actual and presumed bias are present in her case. Freeland lied to the court during voir dire on numerous critical matters that if answered correctly would have been the basis of challenge for cause. Her blatant lies demonstrate her actual bias and the truth of the matters she lied about are proof of both actual and presumed bias. I can imagine no more patently obvious example of why Freeland would have both presumed and actual bias than the fact that her brother was the victim of a homicide remarkably similar to the homicides for which Dyer stood trial.

## A. ACTUAL BIAS: FREELAND'S DISHONESTY AT VOIR DIRE

The Supreme Court has explained that to obtain a new trial on the basis of a juror's actual bias, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984)(plurality opinion).[1] *See, e.g., Burton,* 948 F.2d at 1159 (juror failed to disclose that husband beat her); *United States v. Colombo,* 869 F.2d 149, 152 (2d Cir.1989) (juror failed to disclose that brother-in-law was government attorney); *United States v. Scott,* 854 F.2d 697, 699 (5th Cir.1988) (juror failed to disclose that brother was deputy sheriff); *United States v. Perkins,* 748 F.2d 1519, 1531 (11th Cir.1984) (juror failed to disclose knowledge of defen-

1. The majority states that under *McDonough,* a showing of juror dishonesty is a necessary predicate to obtaining a new trial. *Majority Opinion* at 727–28 & n. 1. This statement is baffling for three reasons. First, five Justices in *McDonough* joined concurring opinions stating that juror dishonesty is not a necessary predicate to a finding of juror bias. 464 U.S. at 556–57, 104 S.Ct. at 850–51 (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring); *id.* at 558, 104 S.Ct. at 851 (Brennan, J., joined by Marshall, J., concurring in the judgment). Second, every other circuit to consider the question has concluded that *McDonough* does not require a finding of juror dishonesty. *Zerka v. Green,* 49 F.3d 1181,

1186 n. 7 (6th Cir.1995); *Amirault v. Fair,* 968 F.2d 1404, 1405–06 (1st Cir.), *cert. denied,* 506 U.S. 1000, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992); *Cannon v. Lockhart,* 850 F.2d 437, 440 (8th Cir.1988). Third, the sole authority cited by the majority, *United States v. Edmond,* 43 F.3d 472 (9th Cir.1994), did not hold that a finding of juror dishonesty is a necessary predicate to a new trial, but held only that a juror's "simple forgetfulness" does not fall within "the scope of dishonesty as defined by *McDonough.*" *Id.* at 474. Were dishonesty a necessary predicate I suggest it has been amply demonstrated on this record.

dant and involvement in other lawsuits); *United States v. Bynum,* 634 F.2d 768, 771 (4th Cir.1980) (juror failed to disclose that brother was convicted felon).

On federal habeas review of a state conviction, "a determination after a hearing on the merits of a factual issue, made by a State court ... shall be presumed to be correct...." 28 U.S.C. § 2254(d) (1992).[2] "[A] trial judge's finding that a particular venireman was not biased and therefore was properly seated [is] a finding of fact subject to § 2254(d)." *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985) (citation omitted); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984). Here, the trial court found that Freeland answered the voir dire questions honestly, and the California Supreme Court held that this decision was not an abuse of discretion. *People v. Dyer,* 45 Cal.3d 26, 246 Cal.Rptr. 209, 227, 753 P.2d 1, 19, *cert. denied,* 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 347 (1988). However, the presumptive correctness of state court factual findings is inapplicable where, as here, "material facts were not adequately developed at the State court hearing," 28 U.S.C. § 2254(d)(3), or, also as here, "such factual determination is not fairly supported by the record." *Id.* § 2254(d)(8).

The trial judge conducted the voir dire at Dyer's trial in June 1983. The judge asked every prospective juror *inter alia* the following questions:

13. Have you or any of your relatives or close friends ever been the victim of *any type of crime?*

15. Have you or any of your relatives or close friends ever been accused of *any offense other than traffic cases?*

(emphasis added).[3] Jessica Freeland answered "no" to both questions. However, Freeland was fully aware at the time she answered to the court that she and several of her relatives had been the victims of violent crimes, and that several of her relatives had been accused of violent crimes.

### The Killing of Freeland's Brother

Let us look first at the evidence concerning Jessica's brother. In October 1977, Edward Sheppard killed Jessica Freeland's brother, Richard, by shooting him in the back of the head. Abrasions on Richard Freeland's head evidenced pistol-whipping.

While Jessica Freeland claims that she answered "no" because she believed Richard's death was the result of an accident, this explanation is patently implausible. The State of California charged Sheppard with murder, and Sheppard plead guilty to voluntary manslaughter. Rosetta Freeland, the mother of Jessica and Richard, testified at Sheppard's preliminary hearing, and Sheppard paid over $1,800 in criminal restitution to the Freeland family for funeral expenses. Jessica Freeland was a named plaintiff in a wrongful death action filed against Sheppard, in which the Freeland family won $15,000. Jessica Freeland admitted that she and Richard had been "very close," Deposition of Jessica Freeland, August 18, 1993, at 32, and that the period after Richard's slaying was "a painful time in our lives." *Id.* at 53. Charles Freeland, the father of Jessica and Richard, testified that Jessica and Richard were both living with their mother and were both young adults at the time, and that Jessica and Richard were "close." Transcript, Evidentiary Hearing at 8–17. He also testified that he believed the killing was not an accident, that he did not remember anyone else in the family saying that the killing was an accident, and that Jessica was angry with him when he refused to share with her the proceeds of the wrongful death action against Sheppard. *Id.*

It defies common sense and is contrary to the overwhelming evidence to conclude that Jessica Freeland was telling the truth when she said no relative or close friend had been the victim of a crime. Jessica and Richard

---

**2.** While Dyer's appeal was pending, The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, Title I, § 104, 110 Stat. 1218, amended 28 U.S.C. § 2254. All references to 28 U.S.C. § 2254 are to the pre-amendment version. *Jeffries v. Wood,* 103 F.3d 827 (1996).

**3.** The meaning of these questions is obvious. The finding of the state court that these questions were ambiguous is thus "not fairly supported by the record." 28 U.S.C. § 2254(d)(8).

were close, they lived in the same house, they were both adults, and Richard's death pained Jessica. The perpetrator was charged with and pled to intentional killing. Richard's father believed the killing was intentional. To conclude that Jessica answered honestly, we must assume that in the wake of Richard's death, Jessica never learned that: 1) Sheppard pistol-whipped Richard's head, 2) Sheppard was charged with murder, 3) Sheppard pled guilty to voluntary manslaughter, 4) Sheppard paid $1,800 in criminal restitution to the Freeland family for funeral expenses, and 5) Jessica's mother, with whom Jessica lived, testified against Sheppard during the criminal proceedings. We must also assume that although Jessica was angry at her father for keeping the $15,000 proceeds of the wrongful death action against Sheppard, she had no awareness of the facts surrounding her brother's death.

### Freeland and Family Members as Victims

I turn now to evidence that other family members, including Jessica Freeland herself, were victims of crimes. Jessica Freeland was assaulted at knife point by her twelve-year-old, mentally disturbed cousin Buddy. She was lying on a couch when Buddy approached her with a knife and pulled her underwear off. There was a struggle, and Buddy "scared the hell out of" Freeland. Afterwards, Freeland's father called the police. Freeland later described the incident as a "sexual assault" and recognized that she had been "attacked." Freeland Deposition at 60, 65.

Freeland claims that she answered "no" during voir dire because the incident was "not anything that I think could be considered like a violent crime that had a major effect on me and I'm still reeling. . . ." *Id.* at 129. However, the question was not whether Freeland was the victim of a violent crime that deeply affected her, but whether Freeland was the victim of "any type of crime." Freeland herself described the incident as an "attack" and a "sexual assault."

Freeland's home was burglarized on "at least" three separate occasions. One incident that Freeland reported "really stands out in my mind" was when the burglars "took

a lot of food and threw it on the floor and killed our fish and kind of trashed the house." In another incident, "[o]ur back door was kicked in." Each time, valuables were taken and the burglars were never caught. *Id.* at 53–54. Moreover, her cars were burglarized on so many different occasions that she could not keep the burglaries straight in her mind: "I think the red car was burglarized, but I can't remember for sure. I've had too many burglaries." *Id.* at 68.

When asked why she answered "no" on voir dire even though she knew that she had been the victim of multiple burglaries of her home and car, Freeland answered:

I didn't have time to rack my brain to remember every time my car or house had been burglarized and it didn't have a bearing on the case to me because if you live in Oakland, I don't know of anyone who lives in Oakland who has never been burglarized. It's just a way of life and it's just the way things go. It was not a traumatic event that caused me to be so bitter that I would irrationally try to pay back someone like Alfred Dyer who has evidently done burglaries or robberies.

*Id.* at 124. Freeland lied to the court. Her attempt at minimalization of the burglaries and rationalizations do not erase the lies. The court, not the prospective juror, makes the determination of whether victimization by burglary is cause for striking a juror. Likewise, whether Freeland felt she had time to answer the court's questions was not her decision to make. The fact that Freeland lived in Oakland rather than Pacific Heights does not change the fact that she was a victim of crimes. Indeed, at least four other potential jurors from Oakland reported burglaries against them to the court. Whether Freeland could be fair despite her victimization was not hers to decide.

### Family Members as Criminals

I turn now to the evidence belying her response that no family members had been accused of crime. In 1970, Jason Caldwell, Freeland's maternal uncle, was arrested and charged with murder. In 1978, Caldwell was charged with armed robbery. Caldwell lived

with Freeland's family on several occasions. Although Caldwell was acquitted of murder, the question was whether a relative had been *accused* of a crime. Freeland admitted that she was aware of the criminal charges. When asked why she didn't disclose this information, Freeland answered: "Am I to reveal everything, the little information I know about other relatives? That's ridiculous. If that's what they wanted and you feel I have been unfair by not saying a distant relative has done something, then let Alfred Dyer get a new trial." *Id.* at 134–35. An uncle who lived with the family from time to time is not a "distant relative." He is "a relative" and close at that. The question pertained to "any of your relatives."

On May 5, 1983, less than a month before voir dire, Melvin Provost, Freeland's estranged husband, was arrested on rape charges. Provost was ultimately sentenced to six months imprisonment and another 30 months probation.

Explaining her "no" answer given at voir dire, Freeland stated:

> When I found out Melvin was in trouble either the case was already over or we were already past voir dire.... And I never read anything that said, "Okay, now somebody in my family is arrested and now I'm supposed to tell everything." Melvin is not a member of my family.

*Id.* at 10. It is difficult to believe that Freeland did not know about her husband's arrest at the time of voir dire. Freeland stated at voir dire that her name was "really" Mrs. Provost and answered to that name, Trial Transcript, *People v. Dyer*, (No. 72540), at 780, she visited Provost within a week of the time she claims she heard about his arrest and she continued to give him money after they separated. Her claim that Provost was not a member of her family is equally specious. At the time of her voir dire questioning, Freeland had observed other prospective jurors claim as kin "ex-in-laws" and a brother-in-law. It is implausible that Freeland thought that the court would not consider her separated husband to be a member of her family.

When asked at a post-verdict deposition whether her father "ever had any problems with the law," Freeland answered: "He kidnaped [sic] us one time and the police finally caught up with us and he was arrested." Freeland Deposition at 64. This incident was part of a divorce dispute between Freeland's parents. At her deposition, Freeland considered the incident to be a "problem with the law"; at voir dire, apparently she did not.

On May 27, 1983, just days before the voir dire, the state of California arrested and charged Freeland's brother, Billy, with narcotics distribution. Billy Freeland had previously been charged with possession of brass knuckles, and with repeated juvenile offenses. When asked whether she knew of the drug distribution charges against Billy Freeland, Jessica Freeland did not answer directly. She stated that she "love[d]" and was "close to" her brother, but that "I can't imagine a sister or brother knowing every possible act that the other was doing."[4] *Id.* at 103.

### This Court's Standard of Review

For two reasons, we need not presume the correctness of the finding by the state trial judge that Freeland answered the voir dire questions honestly: first, "such factual determination is not fairly supported by the record," 28 U.S.C. § 2254(d)(8); and second, "material facts were not adequately developed at the State court hearing." 28 U.S.C.

---

4. Freeland's post-conviction behavior lends further doubt that Freeland could lie about all these matters and still be a fair juror. Freeland has twice used her position as an employee of the California Department of Corrections to review the contents of Dyer's prison file, though prison regulations expressly forbid such conduct. Freeland worked on death row at San Quentin while Dyer was there; she claims she did not know it at the time. Freeland admits having attended "at least one" court proceeding connected to Dyer's post-conviction appeals; she claims she follows the case only because of harassment by Dyer's counsel. Even more disturbing, when Dyer's counsel attempted to secure Freeland's attendance at the evidentiary hearing before the federal district court, Freeland apparently evaded 21 separate attempts to serve her with a subpoena. The federal court hearing would have been the first time that a judge would have observed Freeland's demeanor when confronted with the deposition testimony that showed the discrepancies between her voir dire answers and the facts.

§ 2254(d)(3). As to the first, considered both separately and together, the crimes against Freeland and her family, the crimes committed by her immediate relatives, and the evidence of Freeland's knowledge of these crimes lead to the inescapable conclusion that Freeland lied to the court during voir dire. From Freeland's own mouth is admission that she lied to avoid furnishing information: "I dislike giving information, period. Information that to me is not relevant." *Id.* at 71.

The majority argues that the fact that Freeland is from "a crime-ridden community ... plausibly both affects her understanding of what qualifies as a crime and influenced her answers to Questions 13 and 15." *Majority Opinion* at 729. I find this specious. Where Freeland lived cannot excuse her glib "no," her failure to mention her family's involvement, both as victims and perpetrators, in the crimes of homicide, rape, armed robbery, kidnapping, sexual assault, burglary, and drug dealing. The victims of such crimes suffer no less because they live in the city and not the suburbs, and the perpetrators are no less criminals. Imagine the reception in a money-laundering trial of the argument that the defendant had no idea that the burglary of an Oakland residence, which produced the money to be laundered, was a crime. *See* 18 U.S.C. § 1956(a)(1) (one element of money laundering is "know[ledge] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity"). Yet when Jessica Freeland claims that she did not realize that burglary fell within the term "any type of crime," the majority agrees that burglary in Oakland may not be thought of as a crime.[5]

Moreover, we should not defer to the state court's finding that Freeland was honest because the court did not adequately develop the material facts. At the post-trial hearing before the state court trial judge, Freeland claimed that she answered "no" because she thought the death of her brother was an accident. Transcript, Post-trial Hearing, at 2709. The judge found no "lack of candor."

*Id.* at 2714. When counsel for the defense cited the parallels between her brother's death and the instant case, the state court responded, "There's no foundation establishing how well she knew the brother. We have brothers and we have brothers." *Id.* We now know that Jessica and Richard were close.

Even worse, the relevant evidence concerning the circumstances of Richard's death was not part of the record. The court did not learn that Freeland's mother testified at Sheppard's criminal trial, that Sheppard was charged with murder and pled guilty to voluntary manslaughter, that Sheppard paid Freeland's family $1,800 in criminal restitution, that Freeland was a named plaintiff in a wrongful death action against Sheppard, that the action yielded $15,000, and that Freeland was angry when her father refused to share the proceeds. Nor did the court develop the evidence later revealed in depositions of the sexual assault and multiple burglaries committed against Freeland, or the serious crimes charged against her several immediate relatives.

The California Supreme Court did not remand to allow the development of a better record. While the court specifically considered what evidence it had of the wrongful death action, *Dyer,* 246 Cal.Rptr. at 227, 753 P.2d at 19, it did not have before it the salient facts. It mentioned the existence of but did not analyze the evidence pertaining to the other crimes and victims and perpetrators. *Id.* at 228, 753 P.2d at 20. Moreover, the court's review was for an abuse of discretion. Without the critical evidence, its review could not be meaningful.

In short, Jessica Freeland "failed to answer honestly [several] material question[s] on voir dire." *McDonough,* 464 U.S. at 556, 104 S.Ct. at 849. Dyer thus satisfied the first element of the plurality's test in *McDonough.* As to the second element, (embraced by a majority) "a correct response [by Freeland to the voir dire questions] would have provided a valid basis for a challenge for cause." *Id.* Had Freeland answered the

---

5. The majority fails to take into account that Freeland, herself, worked for the California Department of Corrections.

voir dire questions honestly, the court would have known that Freeland's brother had been shot in the back of the head after being pistol-whipped about the head, just as was one of the victims in this case. It would have known also that Freeland had been the victim of sexual assault, kidnapping, and numerous burglaries, and that three of her relatives had been accused of serious crimes: her uncle of murder and armed robbery, her estranged husband of rape, and her brother of distributing narcotics. Dyer's trial counsel have testified that if they had known this information at the time, they would have moved to strike Freeland for cause. Given the breadth and the depth of Freeland's personal experiences with violent crime, and the extraordinary parallels between one of these experiences and the crime at bar, Freeland's honest answers to the voir dire questions "would have provided a valid basis for a challenge for cause."

### B. IMPLIED BIAS: THE SLAYING OF RICHARD FREELAND

As an alternative to actual bias as grounds for disqualification, "bias [can] be implied or presumed from the 'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships." *Tinsley v. Borg,* 895 F.2d 520, 527 (9th Cir.1990) (quoting *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir.1977)), *cert. denied,* 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991). "That [people] will be prone to favor that side of a cause with which they identify themselves either economically, socially, or emotionally is a fundamental fact of human character." *Allsup,* 566 F.2d at 71 (quoting *Kiernan v. Van Schaik,* 347 F.2d 775, 781 (3d Cir.1965)). While "[t]he Supreme Court has never explicitly adopted or rejected the doctrine of implied bias," *Tinsley,* 895 F.2d at 527, five Justices in *McDonough* joined concurring opinions stating that a court may grant a new trial upon a finding of implied bias. 464 U.S. at 556–57, 104 S.Ct. at 850–51 (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring); *id.* at 558–

59, 104 S.Ct. at 851–52 (Brennan, J., joined by Marshall, J., concurring in the judgment).

We determine de novo the existence of implied bias. As Justice O'Connor has explained, a court that applies the implied bias doctrine need not be deterred by 28 U.S.C. § 2254(d) because "state-court proceedings resulting in a finding of 'no bias' are by definition inadequate to uncover the bias that the law conclusively presumes." *Smith v. Phillips,* 455 U.S. 209, 222–23 n. *, 102 S.Ct. 940, 949 n. *, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring). *See Wood,* 299 U.S. at 133, 57 S.Ct. at 179 (implied bias is "conclusively presumed as matter of law"); *Burton,* 948 F.2d at 1158 ("Whether a juror's bias may be implied from the circumstances is a question of law for this court."); *Cummings v. Dugger,* 862 F.2d 1504, 1509 (11th Cir.) ("Although the Supreme Court has not directly addressed the standard of review for a claim of presumed prejudice, this Circuit has treated the standard as a mixed question of fact and law."), *cert. denied,* 490 U.S. 1111, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989).[6]

We have twice granted a new trial on the basis of a juror's implied bias. In *Allsup,* we presumed that two prospective jurors in a bank robbery trial were biased because they were employed by the bank that had been robbed, though they worked at a different branch. 566 F.2d at 71. We explained: "The employment relationship coupled with a reasonable apprehension of violence by bank robbers leads us to believe that bias of those who work for the bank robbed should be presumed." *Id.* at 71–72. In *United States v. Eubanks,* 591 F.2d 513 (9th Cir.1979), we presumed that a juror at a heroin distribution trial was biased because his two sons were heroin addicts who were in prison for crimes committed to obtain more heroin. We explained: "Regardless of the reason for [the juror's] nondisclosure, we conclude that his sons' tragic involvement with heroin bars the inference that Collins served as an impartial juror." *Id.* at 517. *Cf. Tinsley,* 895 F.2d at 529 (no implied bias where juror at

---

6. We did not address the standard of review to be applied in implied bias cases in *Tinsley,* 895

F.2d at 526–29.

rape trial once provided professional counseling services to rape victim).

Other circuits have likewise reversed convictions on the basis of implied bias. *See Burton,* 948 F.2d at 1159 (10th Cir.) (juror disqualified from trial involving battered woman syndrome defense because she had herself been battered); *Jackson v. United States,* 395 F.2d 615 (D.C.Cir.1968) (at trial of man who murdered his wife upon discovering affair, juror disqualified who previously had affair with a woman murdered by her husband); *United States ex rel. De Vita v. McCorkle,* 248 F.2d 1 (3d Cir.1957) (en banc) (juror who himself had been victim of a robbery disqualified from robbery trial), *cert. denied,* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

Here, Freeland's brother was pistol-whipped about the head, and then shot in the head. Evidence adduced at Dyer's trial indicated that Dyer pistol-whipped Bennie Warren about the head, and then shot him in the head. The similarities are extraordinary. Moreover, Freeland herself had been the victim of a sexual assault and of so many burglaries that she could no longer distinguish among them in her mind. The crime against Richard, as well as the crimes against Freeland herself, certainly made Freeland as problematic a juror as the bank employees at the bank robbery trial in *Allsup,* or the father of the jailed heroin addicts at the heroin distribution trial in *Eubanks.* The court should presume bias.

The majority concedes that at "first glance, it seems extraordinary" that the two homicides are so similar, but argues that "considering the alleged rate of crime in Freeland's neighborhood, her situation is not so surprising or extraordinary." *Majority Opinion* at 731. However, when a brother is slain by a bullet in the back of the head, the majority should not presume that the tendency of the surviving sister to suffer deep and abiding grief and anger is diminished by the local crime rate. Bullets may fly with disproportionate frequency in Freeland's neighborhood, but she is presumed to be as likely as anyone wherever she lives to be affected by the parallels between the slaying of her brother and the slaying of Bennie Warren.

The majority curiously argues that "[a]lthough her brother was killed by a gunshot wound to the head, she also has relatives who have been convicted of crimes. Thus, Dyer has not shown that she would have been biased for or against him." *Majority Opinion* at 731. The rationale seems to be that the crimes committed by and against Freeland's family simply cancel each other out. The majority gives no special weight to the similarities in the intentional slaying of Richard Freeland by pistol whipping and a bullet to the brain and Bennie Warren's like fate. Needless to say, there is no support in the cases for the majority's novel approach. Indeed, we presumed in *Eubanks* that a juror whose sons were in prison would be prejudiced *against* the defendant. 591 F.2d at 517; *see also Burton,* 948 F.2d at 1159 (presuming the victim of battery would be biased *against* a woman who killed her batterer).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Trial counsel is unconstitutionally ineffective when performance is deficient and the defense is prejudiced. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The former element requires proof that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. We review de novo a claim of ineffective assistance of counsel. *Moran v. Godinez,* 57 F.3d 690, 699 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995).

Dyer's trial counsel, John Burris, failed to investigate and present evidence of Dyer's PCP use on the night of the crime, although proof of using PCP would have been potent evidence to support a defense that Dyer's mental state on the night of the killings precluded him from forming an intent to kill.[7]

Competent counsel would have presented evidence to the jury that just hours before

---

7. Under California law, evidence of mental disease, disorder, or defect is admissible on the

issue of whether the accused actually formed an intent to kill-i.e., whether the accused actually

committing bizarre acts of violence Dyer smoked a "sherm," i.e., a cigarette laced with PCP (phencyclidine). Since Dyer took the stand to testify regarding his use of other drugs, he could have testified that he accidentally used PCP that night (he had revealed this to Dr. Smith). Charles Howard would have confirmed this and was willing to testify that he shared a sherm with Dyer that night. Delphine Dismuke stated in a signed declaration that Dyer came to a party at her home that night, that some of her guests smoked sherms, that Dyer suddenly became uncharacteristically violent, and that she believed he had smoked PCP.[8] She was available to testify. Tyrone Ario would have testified that during Dismuke's party, Dyer suddenly became uncharacteristically violent.[9] Robert Fluker (Nora Fluker's brother-in-law) would have testified under subpoena that when he ran into Dyer between the party and the killings, Dyer appeared to be on PCP. The transcripts of the trials of Dyer's co-felons contain further corroborative evidence.[10]

PCP, a drug with unique and overwhelming effects,[11] can best explain Dyer's uncharacteristic and psychotic behavior. The most

rudimentary of investigations by Burris would have revealed the needed information for a defense based upon Dyer's use of PCP. There is a reasonable probability that a jury properly informed of Dyer's PCP use would have returned a conviction less than first degree murder or a sentence less than death. We should find that Burris provided unconstitutionally ineffective assistance of counsel. *See In re Cordero*, 46 Cal.3d 161, 249 Cal. Rptr. 342, 354–58, 756 P.2d 1370, 1382–86 (1988) (defense counsel ineffective for failure to investigate and present evidence of defendant's use of PCP); *People v. Frierson*, 25 Cal.3d 142, 158 Cal.Rptr. 281, 289–93, 599 P.2d 587, 596–600 (1979) (defense counsel ineffective for failure to investigate and present evidence of defendant's use of angel dust); *cf. Wade v. Calderon*, 29 F.3d 1312, 1318–19 (9th Cir.1994) (defense counsel not ineffective for declining to use PCP defense where "there was no evidence that [the defendant] ingested PCP on the day of the offense"), *cert. denied*, 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

## A. PREJUDICE

PCP would explain Dyer's surprising ability to take a nap immediately after injecting

---

formed express malice. *People v. Saille*, 54 Cal.3d 1103, 2 Cal.Rptr.2d 364, 374, 820 P.2d 588, 596 (1991).

8. Dismuke stated: "At one point, [Dyer] suddenly began acting wild. He picked a fight with my brother Roger, who was [Dyer's] friend. It was very unusual for [Dyer] to act in this crazy way." Declaration of Delphine Dismuke, March 7, 1989, at 2.

9. Ario stated, "All of a sudden, [Dyer's] actions changed completely. He started picking a fight.... [His] eyes were wild, he was waving his arms and shouting and threatening violence. I had never seen [Dyer] act like this before." Declaration of Tyrone Ario, January 7, 1989, at 2.

10. Defendant Michael Jackson testified that people were smoking sherms at Delphine Dismuke's party, and that Dyer was subsequently frightened, blank-looking, shaking, sweating, and uncharacteristically violent. Jackson stated, "I never seen him upset or strange like he was that night.... [H]e looked like he was in a trance, like he was—his body was there, but he wasn't there." Trial Transcript, *People v. Jackson*, (No. 74170), at 467. Defendant Cleveland Ario testi-

fied that Dyer was "tripping," shaking, trembling, and sweating. Trial Transcript, *People v. Ario*, (No. 71381), at 11. Bennie Warren, a survivor of the crime, testified that "[h]e seemed like he had turned into a[Mr.] Hyde.... An entirely different person." *Id.* at 253.

11. PCP is a dissociative anesthetic, which means that it impairs normal cognitive brain function. The user performs physical activities without judgment or reasoning. PCP produces a mental state in which the recipient is oblivious to what is happening to his or her body.... Because the individual who has consumed PCP is dissociated from normal cognitive reasoning, bizarre and impulsive behaviors often occur, including spontaneous violence. Declaration of Ferris N. Pitts, Jr., M.D., May 27, 1994, at 7. The use of PCP can induce "random, detached, inappropriate violent acts. It is particularly associated with bizarre episodes of violent behavior." Declaration of Kate McColl Bell, M.D. (known as Kate Yago at the time of trial), Dec. 26, 1994, at 8–9. "PCP is more potent pharmacologically than alcohol, marijuana, cocaine or heroin. The ingestion of these other drugs may exacerbate the effects of PCP, but the effects of the PCP will be dominant." Pitts Declaration at 9.

himself with "speedballs," a mixture of heroin and cocaine. "Consistent with the anesthetic effect of PCP, it is common for an individual intoxicated with PCP to fall asleep or otherwise appear to 'pass out.'" Pitts Declaration at 8. "PCP use could explain Mr. Dyer's apparent ability to sleep for a period of several minutes, despite his ingestion of stimulants. PCP is a powerful dissociative anesthetic, which was originally employed in anesthesia for surgery...." Bell Declaration at 10.

PCP would explain Dyer's partial memory loss: Dyer testified that he remembered pistol-whipping Bennie Warren, did not remember forcing the four victims into the car at gun point, remembered sitting in the car and then getting out and hearing gun shots, and did not remember anything else until the next morning. "PCP users frequently suffer true pharmacological amnesia.... [T]he PCP user may remember only some of his actions." Pitts at 8.

> PCP use could explain his inability to fully recall events at the time of the crime. PCP is severely disruptive to learning and memory; users frequently suffer true pharmacological amnesia as to their behavior in a drug-altered state. This amnesia may affect the ability to recall an entire incident or select portions of the activity and behavior. Thus, Mr. Dyer's inability to recall events for a thirty-minute period is consistent with PCP use.

Bell Declaration at 10.

PCP would also explain Dyer's apparent goal-oriented behavior. While a person on PCP "may perform gross and fine motor functions" and may be able to "describ[e] what he or she is doing or about to do," he or she may be "disconnected from an appreciation of the nature and quality of the act." Pitts Declaration at 8. "Lay observers might well be unable to discern from Mr. Dyer's physical appearance and actions his level of cognitive impairment. Mr. Dyer's apparent 'goal-oriented' behavior could be consistent with his being under the influence of, and being severely impaired by, PCP." Bell Declaration at 9–10.

The state's impeachment of the defense's drug expert, Kate Yago (Bell), M.D., demonstrates the prejudice from the absence of PCP evidence. Burris engaged Yago to express an opinion on the mental effects of alcohol, marijuana, cocaine, and heroin. Burris hired Yago on June 16, 1983, five weeks into the trial and only ten days before Yago had to take the stand, so Yago was completely dependent on Burris for information about the night in question. Burris neglected to inform Yago that Dyer had used PCP that night, though he had been so informed by Dr. Smith. When the state asked Yago on cross-examination how she could explain Dyer's memory loss, given Dyer's use of speedballs and his subsequent actions, Yago answered, "I can't." Yago subsequently stated that if she had known about Dyer's PCP use, she would not have made this highly damaging admission.

Compared to the other drugs Dyer used on the night of the crime, PCP is of a different order of magnitude in its ability to alter the personality, impair cognitive and volitional functions, dissociate a person from his actions, and induce violence. PCP can best explain Dyer's ability to take a nap immediately after shooting up, his partial memory loss, and his apparent goal-oriented behavior. There is a reasonable probability that a jury properly informed of these facts would have returned different verdicts. We should find prejudice.

## B. DEFICIENT PERFORMANCE

Burris' inadequate investigation of Dyer's PCP use during the night of the crimes, and his failure to present any PCP evidence to the jury at either phase of the trial, falls "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064.

Burris knew that Dyer used PCP during the night of the crime. *See Dyer v. Calderon,* No. C–89–3454–VRW, op. at 25 (N.D.Cal. Dec. 12, 1994) ("It is undisputed that Burris had some indication that evidence of PCP might be relevant to Dyer's defense."). When David Smith, M.D., met with Dyer in July 1982, he learned that Dyer used PCP on the night of the crime. Smith passed this information along to Burris, but Burris

"didn't seem that interested in what I had to say." Transcript, Evidentiary Hearing, at 2–432. Burris' handwritten notes clearly contain the words "PCP" and "sherm." When confronted with these notes, Burris admitted that "I certainly operated upon the assumption, I believe, that he smoked [PCP]." Deposition of John L. Burris, May 19, 1994, at 89. At Dyer's evidentiary hearing one month later, Burris backed away from this interpretation of his notes, stating: "The indication was that Mr. Dyer had not [smoked a sherm], but that certainly was an open question." Even if Dyer's use of PCP was an "open question," Burris could have settled the matter by simply asking Dyer if he smoked a sherm.

Burris conducted only a superficial investigation of Dyer's drug use; even worse, he conducted no investigation whatsoever of Dyer's PCP use. In a letter to a professional investigator, Burris raised the possibility that Dyer had "consumed alcohol and smoked marijuana or dope," but neglected to mention PCP. When Burris sent Timothy Bluitt, one of his law clerks, to question witnesses, he instructed Bluitt to gather character evidence and did not even mention the significance of Dyer's drug use to the defense. As a direct result of this oversight, when Bluitt spoke with two witnesses who would have persuasively testified that Dyer used PCP hours before the crime—Charles Howard and Delphine Dismuke—Bluitt asked no questions and accordingly received no information about Dyer's drug use. When Bluitt, an agent of the court, inquired only about Dyer's character, Charles and Delphine probably believed that telling what they knew about Dyer's use of PCP would hurt Dyer.

Burris never uttered the word "PCP" before the jury, though there is a reasonable probability that PCP evidence would have made a difference at either the guilt phase or

the sentencing phase or at both. Very disturbing is the fact that Burris neglected to share his PCP information with the defense's drug expert, Dr. Yago. This failure led directly to Yago's highly damaging and totally unnecessary admission that the drugs she was aware of that Dyer had consumed that night could not explain his memory loss.

The majority argues that Burris' failure to investigate and present evidence about Dyer's PCP use was a legitimate "tactical decision." *Majority Opinion* at 733–35. It is true that "[t]actical decisions that are not objectively unreasonable do not constitute ineffective assistance of counsel." *Hensley v. Crist,* 67 F.3d 181, 185 (9th Cir.1995). However, Burris simply made no decision whatsoever, reasonable or otherwise, regarding PCP because it never occurred to him that PCP had any special significance to a defense based upon the inability to form an actual intent to kill. In post-conviction depositions, Burris claimed that "[PCP] would just have been more drugs," Transcript, Evidentiary Hearing, at 2–212, did not know the difference between LSD and PCP, and claimed that the effects of PCP would have worn off during the three or four hours between the sherm party and the homicides.[12] These statements demonstrate an alarming ignorance of the effects of and elementary distinctions between the drugs involved in the case. Minimal standards of professional competence require that a lawyer who is arguing a defense based upon the incapacity to form an intent to kill learn the basic characteristics of all of the drugs he has reason to suspect the defendant used. Burris did not meet these minimal standards. Burris did not understand the significance of PCP to his own defense. He simply did not take the time or have the time to grasp the essentials of the best defense he could present in this death penalty case.[13]

---

**12.** To the contrary, "[t]he disinhibiting and dissociative effects of PCP would have persisted for 24 hours or longer after Mr. Dyer ingested it." Pitts Declaration at 6.

**13.** Bluitt described Burris' preparation for Dyer's trial as follows:

Mr. Burris, the only litigation lawyer in the office, maintained a hectic caseload. The con-

stant demands of Mr. Burris's trial schedule left little time for reviewing assignments with him. I constantly found it difficult to schedule time with Mr. Burris and our conversations were usually brief and often interrupted with other matters....

I attempted to relay the information that I had learned [from interviewing witnesses] to Mr. Burris. But invariably, because Mr. Bur-

## III. THE *BEEMAN* ERROR

Dyer was found guilty of all counts charged against him: first degree murder of Nora Fluker, first degree murder of Floyd Murray, attempted murder of Belinda Murray, attempted murder of Bennie Warren, and kidnapping of Fluker, Floyd Murray, Belinda Murray, and Warren. The judge instructed the jury as to each count that Dyer could be found guilty if he directly committed the crime or if he aided and abetted its commission. The judge instructed generally as to aiding and abetting liability, making the instruction applicable to Dyer's charges of first degree murder of Fluker and Floyd Murray, attempted murder of Belinda Murray and Warren, and kidnapping of the four victims. The court instructed the jury as follows: "A person aids and abets the commission of a crime if with knowledge of the unlawful purpose of the perpetrator of the crime he intentionally aids, promotes, encourages or instigates by act or advice the commission of such crime."

In *People v. Beeman,* 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984), the California Supreme Court held that such an instruction is unconstitutionally infirm because it allows a jury to convict the defendant as an aider and abetter without necessarily finding that the defendant *intended* to encourage or facilitate the offense with which the principal was charged.[14] On direct review of Dyer's conviction, the California Supreme Court held that the instructions at Dyer's trial were flawed by *Beeman* error, but concluded that the error was harmless. *Dyer,* 246 Cal.Rptr. at 231, 753 P.2d at 23.

On federal habeas review, *Beeman* error is subject to the harmless error review of *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946): "whether the error 'has substantial and injurious effect or influence in determining the jury's verdict.'" *California v. Roy,* —— U.S. ——, ——, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996) (*citing Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)). In *Roy,* the Court further elaborated that "where a judge, in a habeas proceeding, applying this standard of harmless errors is in grave doubt as to the harmlessness of an error, the habeas petitioner must win." *Id.* (citing *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)) (internal quotations omitted).

The majority concludes that the *Beeman* error at Dyer's trial was harmless, asserting that "[n]o evidence in the record could support a finding" that Dyer did not intend to kill Nora Fluker, and that "no evidence supports a finding that Dyer lacked the specific criminal intent to assist in Floyd [Murray]'s murder." *Majority Opinion* at 738. Under *Roy,* however, our inquiry is whether the misdescription of a key element of the crime of aiding and abetting, the omission of specific intent to commit, encourage, or facilitate the confederate's crime, *Roy,* —— U.S. at ——, 117 S.Ct. at 337, places us in grave doubt as to the harmlessness of that error's effect upon the jury's verdict. It does.

The faulty instructions were given with regard to both "the commission or attempted commission of a crime." Thus, the jury could have found Dyer guilty of each of the

---

ris rarely had time for me due to the demands of his other cases, the most I would be able to report to him was that I had spoken to the witness. I was never able to provide an oral report to Mr. Burris about the substance of the interview. Thus, he was never able to instruct me on follow-up questions for the witness that I had interviewed or guidance for questioning future witnesses ...

Mr. Burris was under a tremendous amount of pressure and stress in the months preceding Mr. Dyer's trial. During the entire time that I worked for Mr. Burris [summer 1982 through June 1983], there were an overwhelming number of cases—many of which were high profile, complex cases—that placed endless emotional, physical, and intellectual demands on Mr. Burris.

Declaration of Timothy Bluitt, May 26, 1994, at 1–6.

14. In *Beeman,* the Court concluded that "an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with 1) knowledge of the unlawful purpose of the perpetrator, 2) the intent or purpose of committing, encouraging or facilitating the commission of the offense, 3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." *Dyer,* 246 Cal.Rptr. at 228, 753 P.2d at 20 (citing *Beeman,* 199 Cal.Rptr. 60, 674 P.2d 1318).

charges on either an aiding and abetting theory, or for directly and personally committing the offenses. Because the verdict forms did not specify whether Dyer was guilty as a principal or as an aider and abetter we cannot know from the verdicts themselves upon which theory the jury relied.

We do know that the jury found that Dyer did not cause great bodily injury to either Floyd Murray or Belinda Murray,[15] so we know that the jury convicted Dyer of the murder of Floyd Murray and the attempted murder of Belinda Murray only as an aider and abetter. The jury also found that Dyer intentionally caused great bodily injury to Nora Fluker and Bennie Warren. However, we cannot know whether the jury convicted Dyer of the murder of Nora Fluker and the attempted murder of Bennie Warren as a principal or as an aider or abetter because the jury forms do not make this explicit. As the state trial court found, this finding could support either an aiding and abetting or a direct liability theory by the jury.

The California Supreme Court held, and the majority agrees, that the issue only affects the Floyd Murray murder count, as the jury found that Dyer "personally murdered" Nora Fluker, and intended to kill both Bennie Warren and Belinda Murray. *Majority Opinion* at 737–38. To reach this conclusion, the majority had to assume that the jury found that Dyer personally murdered Fluker and intended to murder Warren and Belinda Murray, yet the jury's findings support either direct or aiding and abetting liability and we cannot know which. The jury only found that Dyer personally inflicted and intended to inflict great bodily injury on Fluker and Warren; California law does not allow us to presume intent to kill from the intentional infliction of great bodily injury. *See People v. Ratliff*, 41 Cal.3d 675, 224 Cal.Rptr. 705, 716–17, 715 P.2d 665, 676–77 (1986).

There are no findings by the jury that demonstrate that the jury found that Dyer had the intent to facilitate the murder or attempted murder of any of the four victims.

The jury could have found that Dyer had different intents towards different victims, or changed his mind in the middle of the incident, or for any other reason lacked the requisite intent. Perhaps the jury simply ignored the question of Dyer's intent altogether, which is precisely the danger of *Beeman* error.

The *Beeman* error is harmful in this case under the *Roy/Kotteakos* standard because it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, 113 S.Ct. at 1714. As a reviewing court, we are unable to conclude that the jury considered Dyer's intent at all, let alone made any findings of intent. In this situation, a conscientious judge can only be "in grave doubt as to the harmlessness of the error," *O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995). I would grant a new trial on this ground.

## IV. EX PARTE COMMUNICATIONS

Two improper ex parte communications tainted the penalty phase of Dyer's trial, one between a witness and three jurors, the other between the judge and several jurors. Each independently is grounds for entitling Dyer to new penalty proceedings.

## A. EX PARTE CONTACT WITH A WITNESS

Bennie Warren, who survived bullet wounds inflicted by Dyer on the night of the crime, testified at Dyer's trial. According to Rick Bartholomew, the jury foreman, Warren approached Bartholomew and two other jurors outside the courthouse after a day of the trial and said "something to the effect of 'Hang him.'" Deposition of Rick Bartholomew, August 11, 1993, at 5.

"In order to safeguard an accused's constitutional right to an impartial jury, private communications between jurors and witnesses are absolutely forbidden." *United States v. Williams*, 822 F.2d 1174, 1187 (D.C.Cir.1987) (footnote omitted); *see also*

---

**15.** Indeed, the prosecutor admitted that the evidence could not establish beyond a reasonable doubt that Dyer shot Floyd Murray.

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (forbidding, "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury"); *Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (forbidding "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge"). Warren's out-of-court communication with three of the jurors, urging hanging, the ultimate issue to be determined at the sentencing phase, violates the prohibition against ex parte communications with the jury. and is clearly prejudicial.

Such error is trial error, reversible if it had a substantial and injurious effect or influence in determining the jury's verdict. *Thompson v. Borg,* 74 F.3d 1571, 1574–75 (9th Cir.) (quoting *Brecht,* 507 U.S. at 629, 113 S.Ct. at 1717), *cert. denied,* —— U.S. ——, 117 S.Ct. 227, 136 L.Ed.2d 159 (1996). We frequently have held that ex parte communication between third parties and the jury was prejudicial and grounds for a new trial. *Lawson v. Borg,* 60 F.3d 608, 610 n. 2, 612–13 (9th Cir.1995) ("substantial and injurious effect" found where one juror told others he heard the defendant "had a violent temper"); *United States v. Maree,* 934 F.2d 196, 201–02 (9th Cir.1991) (for purposes of motion for new trial, actual prejudice found where juror receives ex parte advice from juror's friends regarding petitioner's guilt); *see also Dickson v. Sullivan,* 849 F.2d 403, 406–08 (9th Cir.1988) (prejudice found where two jurors heard a sheriff's out-of-court statement that defendant had "done something like this before"); *Stockton v. Commonwealth of Virginia,* 852 F.2d 740, 743–746 (4th Cir.1988) (prejudice found where the owner of a diner where jurors were dining said to jurors, "I hope you fry the son-of-a-bitch"), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989); *cf. United States v. Endicott,* 869 F.2d 452, 454, 457 (9th Cir.1989) (no prejudice where juror makes improper comments to witness).

Here, it is likely that Bennie Warren's statement had a substantial and injurious influence in determining the jury's verdict. His advice to three jurors that they "hang" Dyer is extremely inflammatory and prejudicial on two levels: he urged the jury to decide, based on his own sense of outrage, that Dyer should hang; and he may have left the impression with the jury, contrary to fact, that all crime victims and their families want revenge. *See, e.g.,* "Group of Murder Victims' Families Opposes Execution," *San Francisco Chron.,* Sept. 30, 1995, at A15.

This face-to-face admonition from a survivor of Dyer's violence may well have had a decisive impact upon a wavering juror. As in *Maree,* Warren presented "strong opinions" in an "aggressive manner" on the "proper outcome of [Dyer's] case." 934 F.2d at 202. As in *Lawson,* the out-of-court statement " 'was both directly related to a material issue in the case and highly inflammatory.' " 60 F.3d at 613 (quoting *Dickson v. Sullivan,* 849 F.2d 403, 407 (1988)). As the Fourth Circuit held in *Stockton,* the jurors "were exposed to the type of pointed and prejudicial suggestion whose utterance encourages the all too human tendency to pursue the popular course." 852 F.2d at 746.

## B. EX PARTE CONTACT WITH THE JUDGE

Jury foreman Bartholomew also testified that while he and other jurors were at a restaurant, they ran into the trial judge. According to Bartholomew, "He commended us for work well done, and he brought a fellow with us to explain that he can't speak to us singularly or alone and that *he was the 13th juror, in essence, and he had to go and review* and that's why he couldn't really socialize.... I think he made reference to *he could change [the verdict] if he thought we were in error.*" (emphasis added) Bartholomew Declaration at 5–6. The encounter occurred after the verdict of guilt and before or during the penalty phase.[16]

---

**16.** When asked when this encounter occurred, Bartholomew testified: "I'm not real sure. It was sometime towards the end of the trial." Bartholomew Declaration at 6. He had previously signed a declaration stating that the encounter with the judge occurred between the guilty and penalty phases of the trial. *Id.*

Statements "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision" are constitutionally impermissible. *Romano v. Oklahoma,* 512 U.S. 1, 8–10, 114 S.Ct. 2004, 2010, 129 L.Ed.2d 1 (1994) (quoting *Darden v. Wainwright,* 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986)). *See Caldwell v. Mississippi,* 472 U.S. 320, 342, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985) (O'Connor, J., concurring in part and concurring in the judgment) (the Constitution forbids "inaccurate and misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case").

The trial judge's ex parte communication that he was the "13th juror" and that he could reverse the jury's verdict does not accurately reflect California law. After every sentence of death returned by a California jury, the trial judge undertakes an automatic review of the verdict. Cal.Penal Code § 190.4(e). During this review, the judge "must independently reweigh the evidence of aggravating and mitigating circumstances and then determine whether, in the court's independent judgment, the weight of the evidence supports the jury verdict." *People v. Edwards,* 54 Cal.3d 787, 1 Cal.Rptr.2d 696, 707, 819 P.2d 436, 447 (1991), *cert. denied,* 506 U.S. 841, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992). However, there is no such review where the jury spares the life of a capital defendant. Moreover, the judge's function during this review "is not to make an independent and de novo penalty determination...." *People v. Mickey,* 54 Cal.3d 612, 286 Cal.Rptr. 801, 852, 818 P.2d 84, 135 (1991) (citation and quotation omitted), *cert. denied,* 506 U.S. 819, 113 S.Ct. 65, 121

L.Ed.2d 32 (1992). Indeed, courts have repeatedly upheld pro forma reviews under § 190.4(e). *See, e.g., People v. Allison,* 48 Cal.3d 879, 258 Cal.Rptr. 208, 222, 771 P.2d 1294, 1318 (1989) (because the propriety of the sentence of death was "self-evident from the record," defendant "was not prejudiced by the trial judge's failure to adequately state his reasons" for upholding the verdict), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990); *Odle v. Calderon,* 884 F.Supp. 1404, 1431 (N.D.Cal.1995) (affirming because the trial judge "made findings in the record, albeit cursorily").

The relationship under California law between the jury and the judge during the sentencing phase of a capital trial is complex; the statement that the judge is the "13th juror" and could change an erroneous verdict is a misleading simplification. Under § 190.4(e), the trial judge may not review a sentence of life imprisonment, may not make "an independent and de novo penalty determination," and may uphold a sentence of death with cursory findings. Contrary to law, a reasonable juror, relying on the words of the trial judge, could have believed that the sentencing verdict was purely advisory and that the judge bore the ultimate burden of deciding Dyer's fate. The judge's comments thus "misle[ ]d the jury as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should [have] for the sentencing decision." *Romano,* 512 U.S. at 9, 114 S.Ct. at 2010 (citation and quotation omitted).[17]

In *Driscoll v. Delo,* 71 F.3d 701 (8th Cir. 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996), decided a year

---

Alfonsa L. Carney, another juror who remembered this encounter, testified as follows:
CARNEY: And as I remember it, the contact we had with the judge was after we had served as jurors. I don't know whether it was during the phase—I think it was after the verdict.
QUESTION: After the guilt phase?
CARNEY: Yes, I think so. I'm not sure of that, but I'm positive we had no contact with him when we sat as jurors.
QUESTION: But it may have been between the guilt and penalty phases?
CARNEY: Yes.
Deposition of Alfonsa L. Carey, August 19, 1993, at 9. Carney apparently confused the end of the

guilt phase with the end of the trial. In any event, she repeatedly agreed that the encounter could have occurred during the penalty phase of Dyer's trial.
The fact that the trial judge so scrupulously avoided ex parte contact with the jurors indicates that the trial was still in progress. The fact that he commended the jurors for work well done indicates only that the guilt phase was over.

**17.** The majority argues that "the judge was simply attempting to avoid any prolonged contact without appearing rude." *Majority Opinion* at 740. Be that as it may, it is his words that count. What they convey to the jury must be our focus.

after *Romano,* the Eighth Circuit reached the same conclusion. There, the prosecutor told the jury during the sentencing phase of a capital trial that the judge was the "thirteenth juror" and could overrule the jury's verdict. *Id.* at 711. The court noted the "technical accuracy" of these statements— Missouri law allows judges to reduce an "excessive" punishment—but nonetheless granted the writ. *Id.* at 713. The court reasoned, in part, that "[t]he judge could not have sentenced [the defendant] to death absent the jury's recommendation to do so," *id.;* the same is true under California law. As in *Driscoll,* the judge in the instant case

> essentially told the jury that it could defer the extremely difficult decision of whether or not [Dyer] should be sentenced to death. As a consequence, the jury made the decision that [Dyer] would be killed without full recognition of the importance and finality of doing so and, therefore, without affording the decision the full consideration it required.

*Id.*

Because of the unacceptably high risk that the judge's ex parte comments misled the jury as to its role at sentencing and thus led the jury to feel less responsibility than it should have for Dyer's fate, there was a substantial and injurious effect on the jury's deliberations, *Brecht,* 507 U.S. at 623, 113 S.Ct. at 1713–14.[18]

## V. CONCLUSION

It is not often that so many grave defects taint one trial. A dishonest juror failed on voir dire to disclose under questioning the repeated and awful violent crimes committed against her family and herself, and by family members, and, particularly, failed to disclose the circumstances of the killing of her brother, Richard. She was biased in fact and also should have been presumed biased as a matter of law. Defense counsel was too busy with other cases to understand the significance of his client's use of PCP hours before the crimes for which he stood trial, and to prepare and present a defense based upon an inability to form the actual intent to kill with the help of experts adequately informed by him and with the presentation of eye-witnesses to the PCP use by his client. His performance fell below an objective standard of reasonableness and prejudiced the defense. The admitted *Beeman* error was not harmless. Jury deliberations at the penalty phase were tainted by the inflammatory ex parte statements of a witness-victim and the misleading and entirely improper ex parte remarks of the trial judge to certain jurors. Any one of the defects entitled Dyer to redress. Cumulatively they compel redress.

Dyer has been sentenced to death without a fair trial. He is entitled to a new trial. Accordingly, I dissent.

Before: HUG, Chief Judge.

### ORDER

#### Oct. 9, 1997

Upon the vote of a majority of nonrecused regular active judges of this court, it is ordered that this case be reheard by the en banc court pursuant to Circuit Rule 35–3.

---

18. The majority argues that the jury instruction corrected any prejudice caused by the judge's ex parte statement. *Majority Opinion* at 740–41. These were the instructions: "I have not intended by anything I have said or done or by any questions that I may have asked to intimate or suggest what you should find to be the facts on the questions submitted to you...." However, this instruction merely reminded the jury that it had to determine the facts for itself without second-guessing the judge. It did not address the power of the judge to reverse the sentence returned by the jury, or in any other way inform the jury that responsibility for deciding whether to execute Dyer rested on its shoulders.